Ex parte WELLS.

No. 29448.

United States District Court
N. D. California, S. D.

June 18, 1951.

C. K. Curtright, Philip C. Wilkins, Sacramento, Cal., Charles R. Garry, San Francisco, Cal., for petitioner.

Clarence A. Linn, Deputy Atty. Gen. of the State of California, for State of California.

GOODMAN, District Judge.

Petitioner is imprisoned in the California State Penitentiary at San Quentin under sentence of death pursuant to a judgment and commitment of the Superior Court of the State of California in and for the County of Sacramento. On January 27, 1950, he filed in this court a petition for the writ of habeas corpus, in which he alleged that the death sentence had been imposed in violation of federally guaranteed rights. We stayed execution of the sentence and retained jurisdiction of the cause to enable petitioner to pursue available state remedies. 28 U.S.C. § 2254; D.C., 90 F.Supp. 855. This he did. On September 13, 1950, his application to the Supreme Court of California for a writ of habeas corpus was denied by a divided court. 35 Cal.2d 889, 221 P.2d 947. On February 26, 1951, the United States Supreme Court, without opinion, denied certiorari. Wells v. California, 340 U.S. 937, 71 S.Ct. 483.

Petitioner now presses for decision on his petition for the writ of habeas corpus, alleging that he has fully pursued his state remedies. Consequently the Warden of the California State Penitentiary at San Quentin was ordered to show cause why a writ of habeas corpus should not issue. The order to show cause came on for hearing on April 10, 1951. It was agreed that the hearing upon the order to show cause should be considered a hearing on the merits as if the writ had issued. There is therefore now presented for determination the federal question tendered by the petition.

At the outset, the court is confronted with the serious question as to whether it should, in this posture of the case, exercise its powers and grant relief to the petitioner. This is indeed a troublesome question for all district judges in cases where the writ is sought because of alleged constitutional infirmities in state court criminal proceedings or judgments. Up to the time of the decision in Darr v. Burford, 1950, 339 U.S. 200, 70 S.Ct. 587, 94 L.Ed. 761, district judges had no clear or unequivocal precedent to guide their actions in proceedings of this kind. But Darr v. Burford has precisely stated that, as a matter of comity between federal and state systems, a lower federal court should not intervene, via habeas corpus, in state criminal proceedings until the United States Supreme Court has been first asked to review the final state court decision. It is for that reason that the law now requires a petition for certiorari in the United States Supreme Court as the final step in the process of exhausting state court remedies before an application for a writ may be made to the federal district court. In my opinion, there is no doubt now that the lower federal courts have power to act upon an application for a writ after declination of the United States Supreme Court to review a state court judgment by denial of certiora-

ri.[1] Darr v. Burford, supra. See Ex parte Royall, 1886, 117 U.S. 241, 6 S.Ct. 734, 29 L.Ed. 868. But the problem remains as to whether this power of the district court should be exercised in a case where the precise constitutional question presented in the petition for the writ has been passed upon and adjudicated by the highest court of the state and the final step by petition for writ of certiorari to the United States Supreme Court has been taken.

The Supreme Court of the State of California is a competent tribunal composed of able and experienced judges. They have interpreted the California statute here under attack and have held that its application in the instant cause is not constitutionally infirm under the due process provisions of the 14th amendment. Under these circumstances, consideration of the complaint of the petitioner must be undertaken with diffidence and great care. It would be unseemly to willy-nilly reach a conclusion at variance with that of the highest court of the State of California. But since the plea of the petitioner rests squarely upon infirmities alleged to be violative of the provisions of the 14th amendment to the Constitution and since this court is specially vested with the power and entrusted with the duty of resolving questions of federal law, we must adjudicate this question in the light of our own view of the federal question involved.

At the time that the order staying petitioner's execution was issued, this court stated, as one of the reasons for staying the impending execution, that the imposition of the death penalty violated the due process clause of the 14th amendment to the Constitution of the United States. We are still of the same opinion. But, petitioner's unsuccessful effort to obtain relief via state process warrants clarification and amplification of the basis for this conclusion.

Petitioner has a long prison record. In March of 1925, at the age of 16, he began a term at the Preston School of Industry for larceny of an automobile. In 1927 he was again committed to Preston for driving an automobile without the consent of the owner. In 1931 while imprisoned at the State prison at Folsom for receiving stolen property, he stabbed and killed another inmate, and was subsequently convicted of manslaughter. He was released from Folsom in January 1941 and was received at the State prison at San Quentin in March of 1942 for driving an automobile without the owner's consent.

In September of 1944, petitioner was convicted of the crime of possessing a prohibited weapon while in prison. A conviction of this offense carries a statutory penalty of imprisonment for a term of not less than five years. Penal Code, § 4502. Under California law, the term of imprisonment is not fixed by the sentencing court. Penal Code, § 1168. It is fixed, between the statutory minimum and maximum, by an administrative body known as the Adult Authority. Penal Code, §§ 3020 and 5077.

On April 10, 1947, petitioner was still in custody upon the commitment for possessing a prohibited weapon while in prison, no term of imprisonment having yet been fixed by the Adult Authority. On that day, he threw a crockery cuspidor at and hit a prison guard. For this act, petitioner was subsequently convicted of violating Section 4500 of the Penal Code of California. Section 4500 makes mandatory the death penalty for any "person *undergoing a life sentence* in a State prison of this State, who, with malice aforethought, commits an assault upon the person of another with a deadly weapon or instrument, or by any means of force likely to produce great bodily injury". (Emphasis added.)

This code section, enacted in 1901, Stats. 1901, p. 6, was designed to protect prison officials and inmates from life-termers whose relatively hopeless position might move them to desperate acts of violence. People v. Finley, 1908, 153 Cal. 59, 61, 94

---

[1]. It is of some interest that even since Darr v. Burford, some circuits have expressed the opinion that denial of certiorari by the Supreme Court should be persuasive against a federal district court entertaining the writ, e. g. See Coggins v. O'Brien, 1 Cir., 1951, 188 F.2d 130; Adkins v. Smyth, 4 Cir., 1951, 188 F.2d 452.

P. 248. At the time of its enactment, Section 4500, then Section 246, necessarily applied only to prisoners whose terms had been definitely fixed at life, since all sentences were then imposed by the courts. That it was reasonable and proper to apply this stringent disciplinary measure to this class of prisoners alone, was recognized by the United States Supreme Court. Finley v. People of State of California, 1911, 222 U.S. 28, 32 S.Ct. 13, 56 L.Ed. 75. Later, after the passage in 1917 of the California Indeterminate Sentence Act, Stats.1917, p. 665, the California Supreme Court held that Section 4500 also applied to those prisoners who were imprisoned for offenses for which the Adult Authority (then the Board of Prison Terms and Paroles) *might* prescribe a life sentence, if the Authority had not prescribed a lesser term. People v. McNabb, 1935, 3 Cal.2d 441, 45 P.2d 334. This holding was reaffirmed upon petitioner's appeal from his conviction. People v. Wells, 1949, 33 Cal.2d 330, at page 334, 202 P.2d 53.

██ Whatever may be thought of the correctness of this construction of Section 4500, it must be accepted by this court. We are bound by the State Court's construction of the State statute. State of Minnesota ex rel. Pearson v. Probate Court, 1940, 309 U.S. 270, 273, 60 S.Ct. 523, 84 L.Ed. 744; Neblett v. Carpenter, 1938, 305 U.S. 297, 302, 59 S.Ct. 170, 83 L.Ed. 182; Standard Oil Co. of Indiana v. State of Missouri, 1912, 224 U.S. 270, 287, 32 S.Ct. 406, 56 L.Ed. 760; West v. State of Louisiana, 1904, 194 U.S. 258, 261, 24 S.Ct. 650, 48 L.Ed. 965; Central Land Co. v. Laidley, 1895, 159 U.S. 103, 112, 16 S.Ct. 80, 40 L.Ed. 91; Iowa Central Ry. Co. v. State of Iowa, 1896, 160 U.S. 389, 393, 16 S.Ct. 344, 40 L.Ed. 467.

The constitutional issue here tendered therefore must be resolved as if Section 4500 imposed the death penalty upon any "person in a state prison of this state, sentenced to life imprisonment and any person, where the statute authorizes a maximum of life, whose maximum sentence has not yet been fixed by the Adult Authority, who with malice aforethought, commits an assault upon the person of another with a deadly weapon or instrument, or by any means of force likely to produce great bodily harm."

The question therefore is: Does the selection, as a class, of state prisoners, whose maximum sentence has not been administratively fixed, for the exceptional penalty of Section 4500, violate the federal guaranty of due process and equal protection of the law?

██ It is well settled that a classification, to be valid under the due process and equal protection clause of the 14th amendment, must be neither arbitrary nor capricious. It must reasonably relate to a legitimate legislative purpose. Schlesinger v. State of Wisconsin, 1926, 270 U.S. 230, 46 S.Ct. 260, 70 L.Ed. 557; Weaver v. Palmer Brothers Co., 1926, 270 U.S. 402, 46 S.Ct. 320, 70 L.Ed. 654. Likewise, such classification must be based on some real and substantial distinctive class characteristict logically related to the evil to be remedied. Power Manufacturing Co. v. Saunders, 1927, 274 U.S. 490, 493, 47 S.Ct. 678, 71 L.Ed. 1165; Truax v. Corrigan, 1921, 257 U.S. 312, 42 S.Ct. 124, 66 L.Ed. 254; Gulf, Colorado, & Santa Fe Ry. v. Ellis, 1897, 165 U.S. 150, 155, 17 S.Ct. 255, 41 L.Ed. 666. This standard is neither absolute nor technical. The factors which condition its application are: (1) the nature of the interest of the individual which is jeopardized; (2) the balance between the inequity complained of and the good sought to be accomplished; and (3) the availability of alternative remedies for the evil sought to be corrected. Mr. Justice Frankfurter, concurring in Joint Anti-Fascist Refugee Committee v. McGrath, 1951, 341 U.S. 123, at pages 162–163, 71 S.Ct. 624.

██ It has long been recognized that a presumption of constitutionality attaches to a considered legislative determination. Nebbia v. People of State of New York, 1934, 291 U.S. 502, 537, 538, 54 S.Ct. 505, 78 L.Ed. 940. But the legislative history of Section 4500 does not permit indulging in this presumption. No legislative determination that the class of prisoners, of which petitioner is a member, had distinctive characteristics related to the object of Section 4500, was possible at the time the

Section was enacted. This is clearly so because no such class of prisoners then existed.

It has been argued that since the simultaneous repeal and re-enactment of Section 4500 in 1941, Stats.1941, Ch. 106, §§ 15, 16, was subsequent to People v. McNabb, 1935, supra, there was legislative consideration of the reasonableness of the classification. But the short answer is that the 1941 repeal and re-enactment was in fact merely to effect a renumbering of the Section and was attendant upon a general rearrangement of Part 3 of the Penal Code.

No rational basis for the classification can be inferred from the type of crime for which the Adult Authority may impose a term of imprisonment up to life. These crimes are varied. They are murder in the second degree, Penal Code, § 190; administering poison with intent to kill, Penal Code, § 216; robbery in the first and second degree, Penal Code, § 213; burglary in the first degree, Penal Code, § 461; lewd conduct with a child, Penal Code, § 288; escape or attempt to escape from prison, Penal Code, § 4530, or from custody while being conveyed to prison, Penal Code, § 4531; sending a prisoner an article to facilitate his escape, Penal Code, § 4535; possession of a prohibited weapon while in prison, Penal Code, § 4502; assaulting another person while serving a sentence of less than life. Penal Code, § 4501. The statutory minimum for these offenses is variously one, five, and ten years. These crimes are not all crimes of violence nor do they include all the crimes involving violence under California law. That their selection was not based upon a legislative determination that they constitute the crimes of greatest seriousness is apparent from the fact that certain other crimes for which a maximum term of years has been fixed by statute carry greater minimum penalties than do most of these offenses. See e. g. Penal Code, Sections 265, 266b, 266g, 447a, 464, and 3024. Thus the mere fact that a prisoner may be imprisoned for an offense for which the Adult Authority might impose a life sentence, does not of it-self mean that he is of a class of prisoners which the legislature has determined have a greater propensity toward violence or have committed more grievous crimes than other prisoners.

Since no rational basis for the classification can be predicated upon the circumstances which place a prisoner within the class at the outset of his confinement, such basis, if it exists, must be sought in the circumstances which keep the prisoner within the class thereafter.

But here again, these circumstances do not constitute a reasonable basis for the classification. A prisoner remains within the class until the Adult Authority has fixed his sentence at a term less than life. If the Adult Authority's failure to so fix a prisoner's sentence were necessarily based upon a finding that the prisoner exhibited dangerous propensities and that his future release was unlikely, then the classification would relate to a legislative purpose to prevent acts of violence upon prison officials and inmates. But, no such finding can reasonably be inferred from the failure of the Authority to fix the sentence at a term less than life, at least until the prisoner has remained confined for some substantial period of time. The Adult Authority may not fix the term of any prisoner until he has served at least six months. Penal Code, § 3020. Thus for the first six months of imprisonment, the fact that the Adult Authority has not acted to fix the term at less than life is entirely without significance.

No time is prescribed by statute within which the Adult Authority must fix a prisoner's sentence or even consider the matter. Until a prisoner has served the minimum term statutorily prescribed, there is no particular necessity for the Adult Authority to fix his sentence or to consider whether a definite sentence less than the maximum should be set. Any number of reasons, entirely unrelated to the prisoner's propensity toward violence, might prompt the Adult Authority to withhold judgment until the minimum term expired.[2] Even after the

---

2. Petitioner had served only half of his minimum term of five years when he committed the offense for which the death penalty was imposed.

expiration of the minimum term, the failure of the Adult Authority to fix sentence at a term less than life would not necessarily mean that the Authority had concluded that the prisoner was a menace to others and could not be released in the foreseeable future. The Authority might refrain from fixing a definite time for a prisoner's release pending the outcome of vocational training or medical or psychiatric treatment or other events which would determine the time most propitious for the prisoner's return to society.

The fixing of a prisoner's sentence may be delayed for a considerable length of time merely by the operation of the Adult Authority's procedural rules. A striking example is the rule that the Authority will not consider the matter of fixing a prisoner's term until he has maintained a clear prison conduct record for six months. Adult Authority Resolution No. 150. Thus, scattered violations of prison rules may delay the consideration of a prisoner's case for years. It might be claimed that the fact that the fixing of a prisoner's sentence has been delayed because he has been found guilty of an infraction of prison rules could be indicative that he is the type of prisoner who should be subject to Section 4500. But this conclusion is unjustified. For it is apparent that a prisoner's record could be marred by a single minor offense such as neglecting his work or using vulgar language.

It must be remembered that the act of the Adult Authority in fixing a prisoner's sentence at less than the statutory maximum is in no sense an act of grace like that of the Governor in granting a pardon. The theory of the indeterminate sentence law is that many, if not most, prisoners can be rehabilitated and safely returned to society. It is to be expected that the body administrating the law will release a prisoner when his rehabilitation is complete. The statutory maximum term does not constitute a legislative determination of the normal time to be served by most prisoners. In fact, generally speaking, a prisoner has every reason to expect that if he conducts himself properly the time he will be required to serve will be closer to the minimum than to the maximum. This is particularly true when there is a substantial spread between the minimum and the maximum. Thus a prisoner whose term is still under initial consideration by the Adult Authority should have as great or greater incentive to conduct himself properly than a prisoner whose term has been fixed.

Hence it is manifest that the statutory classification is not based upon any real or substantial difference in the status of the prisoners within the class, which is related to the purpose of the statute. Indeed, the result of the classification is the most capricious discrimination. To cite what is perhaps an extreme but in no sense an isolated example: a person convicted of burglary and with no prior criminal record may remain in jeopardy of the mandatory death penalty of section 4500 for a considerable time. Yet a hardened criminal, imprisoned for a crime of violence for which a long maximum term of years is prescribed by statute or for which the Adult Authority has in fact imposed a lengthy term, is free from the onus of that Section.

The discriminatory operation of Section 4500 may not be dismissed as of little consequence. Therein lies the peril of grave injustice. It is true that the Section does not become effective unless a prisoner has committed a wrongful assault. But, there is no justification for the attitude that if a prisoner has committed such an assault it is fortunate if he can be prosecuted under Section 4500.[3] The assault need not be of such a serious nature as the language of Section 4500 might indicate. A blow with the fists, provoked by the tensions of prison life, will support a conviction.[4] And, con-

3. In this case, the District Attorney, in fact, suggested that the petitioner's term should *not* be fixed by the Authority, so that if he did commit an assault, he would be subject to the penalties of Section 4500. See 90 F.Supp. 855, at page 857.

4. It has been repeatedly held in California that an assault by means of force likely to produce great bodily injury may be accomplished by means of the hands or fists alone. People v. Hinshaw, 1924, 194 Cal. 1, 227 P. 156; People v. Kimmerle,

viction, absent executive clemency, means death.

The discriminatory effect of Section 4500 is not the unavoidable consequence of any practical difficulty in delineating a classification to meet the legislative purpose. There is no lack of practical alternative classifications which would be fair and would achieve the desired result. For example, the legislative purpose would be substantially effectuated if Section 4500 were applied only to those prisoners who had given a life term by the Adult Authority, and those actually sentenced to life by a Court.

■ The conclusion is inescapable that Section 4500, as construed to apply to those prisoners imprisoned for offenses for which a life term *might* be imposed by the Adult Authority but for whom no term has *in fact* been imposed by that body, has no basis in reason or practical necessity. It is thus violative of the guarantees of the 14th amendment.

The rationale of the Indeterminate Sentence Laws which are in effect in most of the 48 states, necessitates that the authority administering the law be invested with considerable discretion. And, generally speaking, these laws have withstood attack on constitutional grounds. See Lindsey, Historical Sketch of the Indeterminate Sentence and Parole System, 16 Journal of Criminal Law 9, 40–52 (1925). Consequently, we cannot dispute the right of the state to generally exercise its power, via the Indeterminate Sentence Statutes, over the liberty of convicted felons. But when the convict's indeterminate status as a prisoner, as is the case here is made an essential element of a capital crime, it must be disapproved as violative of the mandate of the 14th amendment.

Being of the view that the death sentence imposed upon petitioner by the State Court is invalid under the 14th amendment to the Constitution, the Court concludes that petitioner is entitled to an order [5] vacating and annulling the sentence of death imposed by the Superior Court of the State of California in and for the County of Sacramento.

Counsel may present an order accordingly.

---

2d Dist.1926, 90 Cal.App. 186, 265 P. 525; People v. Score, 2d Dist.1941, 48 Cal.App.2d 495, 120 P.2d 62; People v. Orona, 3rd Dist.1946, 72 Cal.App.2d 478, 164 P.2d 769.

5. See 28 U.S.C. § 2243, for the scope of relief allowable in habeas corpus proceedings.