[Crim. No. 1891.   Third Dist.   Apr. 23, 1968.]

THE PEOPLE, Plaintiff and Respondent, v. WESLEY ROBERT WELLS, Defendant and Appellant.

Garry, Dreyfus & McTernan, Charles R. Garry, Donald L. A. Kerson, Aubrey Grossman and Leo Branton, Jr., for Defendant and Appellant.

Thomas C. Lynch, Attorney General, Doris H. Maier, Assistant Attorney General, and Raymond M. Momboisse, Deputy Attorney General, for Plaintiff and Respondent.

FRIEDMAN, J.—In 1944 a jury convicted defendant Wells, a prisoner in Folsom State Prison, of possessing a knife in violation of Penal Code section 4502. He was sentenced to the term of not less than five years then fixed by that statute.[1] He had discharged his attorney during the trial and conducted his appeal without counsel. His brief was prepared by a fellow inmate. This court affirmed the conviction. (*People* v. *Wells* (1945) 68 Cal.App.2d 476 [156 P.2d 979].)

In 1947 another prison affray resulted in Wells' conviction of aggravated assault by a prisoner serving a life sentence, a violation of Penal Code section 4500. The latter conviction was affirmed on appeal by the State Supreme Court. (*People* v. *Wells* (1949) 33 Cal.2d 330 [202 P.2d 53].) One of the rulings on that appeal was that the "not less than five (5) years" sentence imposed by the 1944 judgment was, under California law, a life sentence which brought Wells within the terms of section 4500. (See also *Ex parte Wells* (1950) 90 F.Supp. 855; *In re Wells* (1950) 35 Cal.2d 889 [221 P.2d 947]; *Ex parte Wells* (1951) 99 F.Supp. 320; *Wells* v. *California* (1964) 234 F.Supp. 467, affd. (1965) 352 F.2d 439, cert. den. (1966) 384 U.S. 1009 [16 L.Ed.2d 1021, 86 S.Ct. 1968].)

Defendant has now moved to set aside the remittitur which this court issued in affirming the 1944 judgment. The motion has been filed on his behalf by counsel. Primarily he alleges that he was deprived of a fair and meaningful appeal, denied his constitutional right to counsel on appeal and suffered interference by prison officials in his attempts to communicate with the appeal court. ■ A motion to recall the remittitur is an acceptable remedy where the remittitur was issued as the result of a criminal appeal in which the appellant's right to counsel was denied. (*People* v. *Campbell* (1966) 239 Cal. App.2d 252 [48 Cal.Rptr. 693]; *People* v. *Collins* (1963) 220 Cal.App.2d 563 [33 Cal.Rptr. 638].) Lest recall of the remittitur without considering the merits of the proposed appeal

---

[1]At that time Penal Code section 4502 provided in part: "Every prisoner committed to a State prison who, while at such State prison . . . possesses or carries upon his person or has under his custody or control . . . any dirk or dagger or sharp instrument . . . is guilty of a felony and shall be punishable by imprisonment in a State prison for a term not less than five (5) years."

The section has since been amended in several respects.

472

needlessly becloud the 1944 judgment which formed the basis of the 1947 conviction, we chose to hear the proposed appeal on its merits without first taking the customary step of acting on the motion to recall the remittitur. (Cf., *In re Mitchell* (1968) 68 C.2d 258 [65 Cal.Rptr. 897, 437 P.2d 289]; *People v. Campbell, supra,* 239 Cal.App.2d 252; see *Wells* v. *California, supra,* 352 F.2d 439.) At this court's direction briefs were filed by Wells' present counsel and by the Attorney General and opportunity provided for additions to the record and for oral argument debating the proposed appeal.[2]

█ The constitutionally protected right to counsel on appeal first enunciated in 1963 by *Douglas* v. *California,* 372 U.S. 353 [9 L.Ed.2d 811, 83 S.Ct. 814], receives fully retrospective application. (*In re Mitchell, supra,* 68 Cal.2d at p. 263.) █ An indigent defendant's failure to request counsel on appeal is not a waiver, for the right does not depend upon a request. (*Swenson* v. *Bosler* (1967) 386 U.S. 258 [18 L.Ed.2d 33, 36, 87 S.Ct. 996]; see also *Anders* v. *California* (1967) 386 U.S. 738 [18 L.Ed.2d 493, 87 S.Ct. 1396].) █ Closely related to the guarantee of counsel on appeal is another fundamental right, that of reasonable access to the courts. "Denial or undue restriction of this right is a denial of due process of law guaranteed to state prison inmates by the Fourteenth Amendment." (*In re Allison* (1967) 66 Cal.2d 282, 288 [57 Cal.Rptr. 593, 425 P.2d 193].) The primary purpose of the latter right is to assure full and timely judicial review of the prisoner's conviction if he desires review. (*Ibid.*) Wells invokes the right of access to the

---

[2] A secondary ground assigned for recall of the remittitur is a claim of denial of counsel at Wells' preliminary examination in the Sacramento Municipal Court. In 1944 many California judges held the view that an indigent felony defendant's right to appointed counsel matured only after he was held to answer to the charge in the superior court. At Wells' preliminary examination the magistrate informed him that he had a constitutional right to counsel at all stages; that if he were held to answer and unable to employ an attorney, the superior court would appoint one. The accused was unrepresented during the ensuing hearing. Wells may not now claim denial of counsel at his 1944 preliminary examination. He was represented by counsel in the superior court. His failure to move to set aside the information precludes him from questioning any illegality in his commitment, either on appeal or by collateral attack. (*People* v. *Harris* (1967) 67 Cal.2d 866 [64 Cal.Rptr. 313, 434 P.2d 609]; *In re Wells* (1967) 67 Cal.2d 873 [64 Cal.Rptr. 317, 434 P.2d 613]; see also *Wells* v. *California, supra,* 234 F.Supp. 467.) Absence of such a motion in no way reflects upon the competence of his trial counsel, for an order setting aside the commitment would only have resulted in the defendant's return to the municipal court for another preliminary examination. (*People* v. *White* (1963) 213 Cal.App.2d 171, 176 [28 Cal. Rptr. 656].)

courts, for he asserts that the prison officials interfered with his attempts to communicate with this court while his appeal was pending.

In 1944 this court did not automatically appoint counsel for convicted appellants claiming indigence, nor did it routinely inform them of a right to counsel on appeal. At that time, the filing of a record on appeal would evoke a notice from the court clerk to the appellant, instructing him to file his brief within a designated period. Upon the filing of a brief *in propria persona,* the court would make an independent investigation of the record for error other than that urged by the appellant. The court would grant an application for appointment of counsel when that action seemed advantageous to the defendant or helpful to the court. (See *People* v. *Wilson* (1962) 208 Cal.App.2d 256, 257 [25 Cal.Rptr. 97].) Such appears to have been a customary procedure among California appellate courts in the years preceding *Douglas* v. *California.* (See *People* v. *Hyde* (1958) 51 Cal.2d 152, 154 [331 P.2d 42]; *People* v. *Douglas* (1960) 187 Cal.App.2d 802, 812 [10 Cal.Rptr. 188]; *People* v. *Logan* (1955) 137 Cal.App.2d 331, 332-333 [290 P.2d 11].) Wells, however, does not claim that he was ignorant of the availability of court-appointed counsel on appeal. Instead, he alleges, truthfully or not, that he sought such counsel at the hands of this court. Thus he is not in the situation of a defendant deprived of counsel through a coupling of the court's failure to inform him and his own ignorance of his rights.

In a declaration supporting his motion to recall the remittitur, Wells states that during most of the time occupied by his appeal he was held in solitary confinement in Folsom Prison; that his requests for access to the law library were rejected; that his brief on appeal was prepared by another inmate who was not a lawyer; that he wrote letters to this court declaring that he was indigent and needed a court-appointed lawyer to prosecute his appeal; that the prison officials refused to transmit these letters because they contained criticism of the prison administration. The inmate who wrote the brief states that, aside from brief messages, he had no opportunity to confer with Wells, and the brief was largely the product of his own guesswork.

The Attorney General has filed copies of prison records demonstrating that Wells was aggressive during the period in question; that he told the warden he would have access to a knife so long as he was at Folsom; that he indulged in fre-

quent outbursts of physical violence, which included attacks upon prison guards and a prison doctor. These records convince us that Wells' solitary confinement during the period of his appeal was necessitated by his own violent, assaultive behavior; that the prison authorities acted out of concern for discipline and safety, not from a desire to prevent him from conducting an effective appeal.

Prisoners have a right to prompt and timely access by mail to the courts. (*In re Ferguson* (1961) 55 Cal.2d 663, 676 [12 Cal.Rptr. 753, 361 P.2d 417].) Wells' assertion that this right was denied him is not credible. This court finds untrue his allegation that prison officials intercepted and withheld letters requesting this court to appoint counsel on appeal. There are four grounds for so finding: First, routine records of incoming and outgoing prisoner mail fail to designate any such letters, although they include one entry of a "stop" on an unrelated letter by Wells. Second, in a sworn declaration attached to the Attorney General's return, the then warden of Folsom Prison declares that he had a consistent policy "to permit free communication between inmates and the Appellate Courts with respect to any appellate matter," including letters which criticized prison officials. Third: Wells wrote to this court on January 13, 1945, requesting a copy of the respondent's brief, and on February 3, 1945, complaining of hindrances by prison officials and confiscation of his legal papers (including, apparently, a draft of his closing brief), requesting a two-week continuance and expressing a wish to file a closing brief. Although critical of the prison officials, the February 3 letter passed the prison censorship, a circumstance quite inconsistent with Wells' allegation that other critical letters to the court were barred from the mail.[3]

The fourth basis is an inference drawn from correspondence between Wells and the warden. On November 19, 1944, he wrote the warden stating that he needed assistance in the presentation of his appeal and wished to confer with his "collaborater" for that purpose. On November 20 the warden sent him the following note: "IF BY YOUR COLLABORATOR YOU

___

[3] In reply to Wells' February 3 letter, the clerk of this court wrote him on February 6 stating that the case had been called for hearing the previous day and ordered submitted on the briefs on file; informing Wells that he would nevertheless be permitted to file a closing brief on or before February 15; as to his complaint of hindrance, stating that the court had no control over prison officials' conduct of their duties. No closing brief was filed. The collaborator's possession of legal papers of another inmate apparently violated prison rules, and the papers were taken from the collaborator.

MEAN YOUR ATTORNEY YOU WILL BE PERMITTED TO HAVE AN OPEN INTERVIEW WITH HIM ANY TIME HE CALLS AT THIS INSTITUTION.'' On November 21 Wells wrote the warden reminding him that he had no attorney and was ''on court record'' as representing himself; that he was not in a position to prepare his case properly; that he wished a named inmate (the word ''inmate'' being heavily underscored) to help him present his appeal; that he also needed a typewriter and access to law books; repeating, at the end, the name of the inmate with whom he wanted to confer. Two notes from the warden dated November 22 informed Wells that no inmate would be permitted to go to his cell but that a typewriter and any needed law book would be secured for him. Wells' letters lead us to the view that he was deliberately maintaining a choice he had made in the trial court, to dispense with the services of an attorney and to rely upon his own notions of effective strategy.

Thus Wells is fastened not only with awareness that appointment of counsel was possible, but also with a deliberate choice to refrain from requesting such appointment. This choice, coupled with prison restrictions imposed upon him as a result of his own aggressions, combined to produce the presentation on appeal which he now denounces as inadequate and ineffectual.

However heavy Wells' own responsibility for the quality of his appeal, the hindsight of later constitutional developments reveals that he was not accorded adequate opportunity for an effective appeal. Regulations reasonably justified by prison safety may collide with an inmate's recourse to the courts. At the collision point some accommodation between prison needs and individual rights is necessary.[4]

A prisoner is entitled to consultation with his attorney not only while preparing for trial, but also during the pendency of an appeal. (*In re Ketchel* (1968) 68 Cal.2d 397, 400 [66 Cal.Rptr. 881, 438 P.2d 625; *In re Allison, supra,* 66 Cal.2d at p. 286.) Prison restrictions on an inmate's pursuit of his remedies violate no civil rights, provided their purpose or effect, or the means adopted, do not unreasonably hamper his access to the courts. (*DeWitt* v. *Pail, supra,* 366 F.2d at p. 686.)

[4] A number of court decisions attempt such accommodation. See, e.g., *In re Allison. supra,* 66 Cal.2d 282; *In re Ferguson, supra,* 55 Cal.2d 663; *In re Chessman* (1955) 44 Cal.2d 1 [279 P.2d 24]; *DeWitt* v. *Pail* (9th Cir. 1966) 366 F.2d 682; *Hatfield* v. *Bailleaux* (9th Cir. 1961) 290 F.2d 632.

■ If a lawyer could not effectively represent Wells without opportunities for consultation, his nonlawyer-collaborator could not do so either. Wells' isolation and the prevention of consultation with his brief writer were not imposed for the *purpose* of hampering his appeal, yet had that *effect*. The remedy lay not with the prison authorities, but with this court. His inmate-prepared brief was filed on December 18, 1944. On its opening page the brief stated: "Appellant is confined in solitary confinement at the prison and has been since the alleged offense on August 15, 1944. This brief is written in the interest of justice for appellant by prison inmate who has a very limited knowledge of law."

The brief writer's statement could only arouse judicial doubt as to the brief's completeness and competence. Wells' letter of February 3 complaining of hindrances and confiscation of his legal papers should have aroused further doubt. Had this court in 1945 been gifted with the constitutional hindsight emanating from *Douglas* (and from *Swenson*, its corollary), doubtless an offer to appoint counsel would have been forthcoming. Since these decisions are fully retrospective, that hindsight must now form the standard for measuring the court's conduct of the case in 1945. An offer of counsel could have been accepted or rejected by the appellant. Rejection would have demonstrated his satisfaction with the inmate-prepared brief on file. Acceptance would have permitted the attorney-client consultation offered by the warden. Even at the stage represented by Wells' February 3 letter, it was not too late to supply legal representation. (*In re Mitchell, supra,* 68 Cal.2d at p. 263.) The offer, however, was not made. The case was permitted to enter the decisional stage notwithstanding strong evidences of strangulated, incompetent preparation. The point is that an offer to appoint an attorney would have represented an obvious and complete accommodation of the dual interests of prison safety and access to the courts. The circumstances thus call for consideration of the proposed appeal on its merits as presented by the defendant's present counsel.

### Trial Court Proceedings and Evidence

Upon Wells' 1944 arraignment in the superior court, an attorney was appointed to represent him. Three days before the trial date Wells appeared and requested the attorney's withdrawal. The request was granted. At the opening of the trial, during presentation of the prosecution case and part of the defense evidence, he was represented by a second attorney.

The attorney made an opening statement, telling the jury that the defense would show that an inmate named Brown had threatened Wells with attack and Wells had picked up the knife in self-defense. After several defense witnesses had testified, Wells requested withdrawal of the second attorney and permission to conduct his own case. Wells then presented several more witnesses and took the stand himself. The attorney, however, was later permitted to return to the trial to make the defense arguments to the jury.

We summarize the evidence: Two prison guards called as prosecution witnesses testified that they had been in the prison kitchen during the midday meal; that they saw Brown back into the kitchen from the adjoining mess hall and defendant Wells advance toward him; that Brown was bleeding from cuts in the chest; that Wells had a knife in his hand; that, although told to surrender the knife, Wells refused to do so but offered to take the knife to the office of the captain of the guard and surrender it to the captain. One of the guards accompanied Wells to the captain's office, where Wells laid the knife on a desk.

Other witnesses described a knife affray in the mess hall, which happened after Wells requested another inmate to call Brown in from the kitchen, where the latter worked. Wells had brought a knife into the mess hall, concealed between the pages of a music book. He placed the knife on a bench, covering it with his jacket. Brown approached Wells with his hand in his pocket. After a brief exchange of words Wells picked up the jacket in his left hand and the knife in his right. Brown too had a knife and the two men struck at each other. Wells wounded Brown in the chest and abdomen; the latter backed into the kitchen. At some point Wells struck the knife from Brown's hand. As to which of the two was the aggressor, the evidence was in conflict.

Although the prosecution objected to evidence predicated on the theory of self-defense, such evidence was admitted, the court indicating that its jury instructions would define the effect of such evidence.

### Propriety of Jury Instructions on Criminal Intent and Self-Defense

The jury instructions are now part of the record, although not included at the time of the 1945 decision. Defendant assigns error in instructions on criminal intent and self-defense. The court rejected a standard instruction on criminal intent, combining the provisions of Penal Code sections 20

and 21,[5] and instead instructed the jury: "When the intent with which an act was committed is not made an affirmative element of the crime and the law under which defendant is being prosecuted does not so make it, the law imputes that the act done knowingly was done with criminal intent."

Another instruction read in part: "The defendant is charged with the unlawful possession of the knife (introduced in evidence) at a point marked ① on the map, which was at a time subsequent to the testimony as to the physical violence between Wells and Brown[6]. . . . This case is not one where defendant is charged with assault with a weapon. He is charged with willfully, knowingly and unlawfully having possession of a dirk or knife. Defendant stated that he secured the knife or dirk outside of the mess hall, and that he himself placed it on a seat or bench near where the trouble between him and Brown took place.

"You are instructed that defendant cannot claim self defense, nor that he was justified in the possession, custody or control thereof, if as stated he himself placed the knife on the bench, and if you find that he grabbed the knife, even though he claims to have done so in self defense. The law does not justify a prisoner in arming himself with a knife or dirk even though he believes he is later to be attacked by another prisoner."

■ Although criminal statutes are not often construed to impose sanctions in the absence of *mens rea* or guilty intent, an exception occurs where the statute is an expression of a legislative policy to be served by strict liability. (*People* v. *Hernandez* (1964) 61 Cal.2d 529, 532-533 [39 Cal.Rptr. 361, 393 P.2d 673, 8 A.L.R.3d 1092] ; *People* v. *Vogel* (1956) 46 Cal.2d 798, 801 [299 P.2d 850] ; Witkin, Cal. Crimes (1963) §§ 62, 63, 152.) ■ Section 4502 of the Penal Code serves an objective demanding relative inflexibility and relatively strict liability. Its objective is protection of inmates and prison officials against assaults by armed prisoners. (*People* v. *Harris* (1950) 98 Cal.App.2d 662, 666 [220 P.2d 812] ; *People* v. *Wells, supra,* 68 Cal.App.2d at p. 481.) It is one of the

---

[5]Penal Code section 20: "In every crime or public offense there must exist a union, or joint operation of act and intent, or criminal negligence."

Penal Code section 21: "The intent or intention is manifested by the circumstances connected with the offense, and the sound mind and discretion of the accused. All persons are of sound mind who are neither idiots nor lunatics, nor affected with insanity."

[6]At this juncture the court was referring to the prison kitchen as depicted on a blackboard chart of the mess halls and kitchen.

"stringent statutes governing prison safety." (*People* v. *Romo* (1967) 256 Cal.App.2d 589, 595 [64 Cal.Rptr. 151].) Its purpose would be frustrated were prisoners allowed to arm themselves in proclaimed or actual fear of anticipated attack by other inmates. Thus a group of California decisions place section 4502 among the statutes whose violation does not depend upon proof of guilty intent, holding that its prohibition is absolute; that it is enough to show the defendant's knowing possession of the forbidden weapon; that his purpose of arming himself for self-defense against an anticipated assault is no defense. (*People* v. *Marcus* (1953) 120 Cal.App. 2d 347, 348 [260 P.2d 1051]; *People* v. *Crenshaw* (1946) 74 Cal.App.2d 26, 30 [167 P.2d 781]; *People* v. *Wells, supra,* 68 Cal.App.2d at p. 482.) Other decisions accept strict liability as the general rule, but suggest by dicta the possibility of two extremely narrow exceptions: one, that the accused was in immediate danger when he armed himself and without opportunity to seek the protection of prison authorities, or second, that his possession was authorized for the performance of prison duties such as kitchen or shop work. (*People* v. *Purta* (1968) 259 Cal.App.2d 71, 73-74 [66 Cal.Rptr. 38]; *People* v. *Otis* (1959) 174 Cal.App.2d 119, 125 [344 P.2d 342].)

All these decisions expressly or implicitly accept the proposition that self-defense against a future, anticipated assault is no defense to a charge of violating section 4502. On the assumption that the two narrow exceptions represent available defenses, defendant brings himself within neither one. The evidence showed without conflict that he had armed himself with the knife in the mess hall when Brown was not in the room and when danger was not imminent. The first quoted instruction correctly told the jury that knowing possession was necessary. (*People* v. *Patterson* (1951) 102 Cal.App.2d 675, 677-678 [228 P.2d 51].) The second quoted instruction correctly told the jury that Wells' arming himself in the belief that he might later be attacked did not justify his action.

██ The information filed by the district attorney charged possession of the knife on a certain day without reference to any particular room or area of the prison. At the commencement of the last-quoted instruction, the trial court directed the jury to limit itself to the question of Wells' possession of the knife in the prison kitchen, after he and Brown had made their way into that room from the adjoining mess hall. The instruction was contradictory because its last

paragraph referred to evidence that the defendant had the knife on a bench (which was in the mess hall, not the kitchen). We discern no valid reason for the limitation in the opening part of the instruction. It was erroneous but harmless to the defense.

Even if, as a matter of law, an accused may show that he gained possession to defend himself against an immediate attack, the evidence demonstrated that Wells had armed himself in a nonemergent situation. His possession was thus unlawful, and none of the ensuing events altered its unlawful character. Essentially the instructions declared that the law did not justify the accused in arming himself in the belief that he would later be attacked. That declaration did not at all misstate the law. Although not models, the challenged instructions were not prejudicially erroneous.

### Sufficiency of the Evidence

Although defendant does not directly charge lack of substantial evidence to support the verdict, he contends that he "did not possess the knife within the meaning of section 4502." His thesis is that the court's jury instructions limited the charge of possession to the prison kitchen and to the period of time beginning with the guard's demand that Wells turn the knife over to him; this limited and brief possession, he urges, had the officers' acquiescence and it terminated when he "voluntarily and willingly" placed the knife on the captain's desk.

The contention has no merit. The evidence demonstrated an earlier stage of possession, in the prison mess hall. Even as limited by the instructions, however, the charge was amply sustained, since nonconflicting evidence demonstrated Wells' possession of the knife in the prison kitchen before he was ordered to turn it over to the guards.

### Claim of Self-Incrimination

Wells requested withdrawal of his trial counsel after several defense witnesses had testified. The judge did not inform Wells that he had a constitutional privilege not to testify. After four more defense witnesses had testified, Wells took the stand himself. In essence, he told of threats by Brown and of his own efforts toward amity; of arming himself with a knife as he entered the mess hall; of carrying it between the pages of a music book and concealing it beneath a jacket at his seat in the mess hall; of sending a prisoner friend to talk peace with Brown; of Brown's approach, hand in pocket, and

his plea to Brown to take his hand from the pocket and stop advancing; of the ensuing fight.

When an unrepresented defendant is about to take the stand in a criminal case, the court must make certain that the defendant is aware of his constitutional privilege not to testify. (*People* v. *Kramer* (1964) 227 Cal.App.2d 199, 201-203 [38 Cal.Rptr. 487]; *People* v. *Glaser* (1965) 238 Cal.App. 2d 819, 828-829 [48 Cal.Rptr. 427].) Absence of the warning is now assigned as reversible error.

The record supplies some basis for the belief that Wells was aware of the privilege. He had had previous experience in criminal proceedings. He conducted his portion of the trial with a degree of sophistication and finesse. Since his former attorney returned to the case for the purpose of jury argument, it is reasonable to infer that he remained in the courtroom to hear the remaining witnesses, providing Wells an opportunity for legal advice. Nor does Wells now assert that he was actually ignorant of his right to refrain from testifying. He relies instead on the silence of the record. To demand that one of his position make out a prima facie case of ignorance by a simple averment of fact flies in the face of no constitutional mandate. Case law, however, calls for a record which shows on its face an informed and intelligent waiver of a constitutional right. (See *Carnley* v. *Cochran* (1962) 369 U.S. 506, 513 [8 L.Ed.2d 70, 75-76, 82 S.Ct. 884]; *Johnson* v. *Zerbst* (1938) 304 U.S. 458, 465 [82 L.Ed. 1461, 1467, 58 S.Ct. 1019, 146 A.L.R. 357]; *In re Johnson* (1965) 62 Cal.2d 325, 333 [42 Cal.Rptr. 228, 398 P.2d 420]; *People* v. *Kramer, supra,* 227 Cal.App.2d 199.) Although the present record arouses suspicion of an informed waiver, it falls short of demonstration. Through the trial court's failure to inform the defendant of his right to refrain from testifying, constitutional error occurred.

Some incursions on the guarantee against self-incrimination may turn out to be so harmless in the setting of a particular case that they do not warrant reversal. (*Chapman* v. *California* (1967) 386 U.S. 18, 22-24 [17 L.Ed.2d 705, 709-711, 87 S.Ct. 824]; *People* v. *Ross* (1967) 67 Cal.2d 64, 73-74 [60 Cal.Rptr. 254, 429 P.2d 606]; see also *People* v. *Glaser, supra,* 238 Cal.App.2d at p. 829; *People* v. *O'Bryan* (1913) 165 Cal. 55, 67 [130 P. 1042].) Affirmance is possible notwithstanding the error, if the reviewing court finds no reasonable possibility that the error affected the outcome of the trial. (*People* v. *Ross, supra.*)

Here two guards called as prosecution witnesses had viewed the last part of the affray and had seen the knife in Wells' hand. In furtherance of an announced theory of self-defense, Wells' attorney described to the jury the proposed testimony designed to support it. Before the attorney's withdrawal, two inmates (Quinn and Maxey) were called as defense witnesses and described the outbreak of the knife fight in the mess hall. After the attorney's withdrawal and before taking the witness stand himself, Wells called Terrell, another inmate, who described the fight in the mess hall. All three of these inmates testified to the knife in Wells' hand. After testifying himself, Wells called an inmate named Evans to the stand. By his own questions Wells elicited Evans' testimony that in the mess hall Wells had told Evans of the jacket with the knife concealed beneath it, requesting Evans to take these articles out to the prison yard for him if he, Wells, did not need them. Evans then described the outbreak of the fight, although he was not in a position to see the knives.

. Aside from the revelation of minor details, Wells' own testimony simply reiterated a story well known to the jury. It added nothing new to the proof of guilt, seeking only the limited objective of fortifying the self-defense claim, a claim which was ineffectual as a matter of law. Beyond any reasonable doubt, the verdict would have been the same had Wells been warned by the court and had he refrained from taking the stand. The error was harmless.

### Claimed Misconduct of District Attorney

As a ground for reversal Wells charges improprieties in the prosecutor's closing argument to the jury. Although the arguments of prosecution and defense counsel were not transcribed verbatim as part of the reporter's transcript on the 1944 appeal, Wells now relies on a statement of the trial judge offering the defense attorney a surrebuttal argument after the prosecutor's closing argument. The offer was made because, according to the trial court, the deputy district attorney's closing argument had gone ''a little beyond'' an unrevealed ruling by the court.[7] The offer was accepted by the defense attorney. The claim is now made that improprieties in

---

[7]The following is the court's full statement:

''THE COURT: Mr. Seely [deputy district attorney], I am not so sure but that you went a little further than the Court suggested, and if the other side thinks you did, I will give them a chance to reply to it, because the Court's ruling was that you should confine yourself to the possession of the knife. You went a little beyond that, so, if there is something you have gone into that Mr. Carr [defense attorney] would like to reply to, I will give him the opportunity.''

the district attorney's argument "may be inferred" from the court's statement.

Moreover, defendant assigns lack of a verbatim transcript of the prosecutor's argument as an additional reason for recalling the remittitur. At the time of the 1944-1945 appeal, rule 33 of the Rules on Appeal (now rule 33, California Rules of Court) provided for a "normal" record on appeal, excluding jury arguments from the reporter's transcript, but permitting application to the trial court for additions to the normal record by a designation of the desired material and a description of the points of intended reliance justifying its inclusion. The notice of appeal filed by Wells' inmate-collaborator requested inclusion of the district attorney's opening statement and, in sweeping terms, "all proceedings . . . up to and including the proceedings at the time of judgment. . . ." The notice did not specifically request transcription of the arguments of the jury. Since the notice supplied no justification for material outside the normal record, the trial court directed preparation of the normal record only. Thus the reporter's transcript prepared in 1944 did not contain a verbatim transcript of the attorneys' jury arguments.

Were absence of the transcription traceable only to defendant's inability to consult with his inmate-collaborator in the preparation of his appeal, the claim would have more significance. Defendant, however, had the ability to raise his claim of improper argument and, so far as the record goes, did not do so until 1967. In his letters to this court of January 13 and February 3, 1945, he asserted no failure to receive the brief prepared for him by his collaborator. Yet he made no assertion of improper jury argument as an additional ground of reversal. In 1949, when he was under death sentence for the 1947 assault,[8] he sought recall of the remittitur in this case, as he does now. He contended that lack of an appeal record including jury instructions and arguments to the jury had misled the appellate court into rejecting his claim of self-defense, "while in reality that was the sole reason the defendant possessed the knife." Although represented by counsel in his 1949 application, he made no complaint then of misconduct by the district attorney. So far as the record goes, he made no charge of prosecution misconduct and no request for transcription of the argument until 1967, 23 years after the trial. At that time Wells' counsel was informed that the reporter had died and his notes were no longer available. The

---

[8] The sentence was lated commuted to life imprisonment.

claim of prejudicial misconduct is an afterthought based upon an unjustified inference from the trial court's observation that the prosecutor had gone "a little beyond" the court's ruling.

Although any exploration of the trial judge's remark involves speculation, the record militates against the implication that it was actuated by prejudicial misconduct of the prosecutor. Self-defense, not a denial of possession of the knife, was the sole trial theory of the defense. The prosecutor's objection to evidence of self-defense had been provisionally overruled, the trial judge preferring to defer his ruling on the significance of the issue. The reporter's transcript states that during the jury argument by Wells' attorney (as well as during the surrebuttal argument permitted him by the court), there were numerous objections by the district attorney and discussions of law by court and counsel. The transcript notes no objection whatever during the prosecutor's arguments. The absence of objection by Wells' trial attorney is significant, for the attorney was vigorous during the intervals of activity permitted him by his client. The "ruling" referred to by the trial judge was apparently a ruling on the self-defense issue, that being the only substantial issue in the trial. The district attorney, it may be inferred, went outside that ruling in commenting on the credibility of the defense witnesses. However irrelevant to the question of guilt, the self-defense issue had been created by the defense. In debating that issue, the prosecutor did not trespass beyond the scope of the case as made by the defense. In offering surrebuttal argument to the defense, the trial court gave no indication that the prosecutor had indulged in prejudicial improprieties. The inference is justified—both from defendant's 23-year silence on the point and from the trial circumstances—that no such improprieties occurred.

Having considered all the contentions defendant would advance in appealing on the merits, the court concludes that no reversible error would be shown. Recall of the remittitur would be an idle act and the motion is therefore denied.

Pierce, P. J., and Regan, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied June 19, 1968.