[Crim. No. 9839.   Second Dist., Div. Four.   Feb. 10, 1965.]

THE PEOPLE, Plaintiff and Respondent, v. REYNOLD EUGENE BARKER, Defendant and Appellant.

Irving S. Feffer, under appointment by the District Court of Appeal, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and Herbert Davis, Deputy Attorney General, for Plaintiff and Respondent.

FILES, P. J.—The only question raised by this appeal is whether the trial judge erred in refusing to allow a defense witness to testify upon the ground that such testimony would subject the witness to prosecution for perjury.

The information charged appellant Barker and his codefendant, Saxton, with the crime of robbery, in violation of Penal Code section 211. Both pleaded not guilty and were tried before a jury. Each was represented by separate counsel.

Due to the nature of the question presented, a detailed statement of the evidence is unnecessary. The skeleton facts are that the victim, a woman, was walking alone on Lake Avenue in Pasadena, south of Belvidere Street, when a man approached her from behind, knocked her down, took her purse, and ran. A passing motorist saw the victim prone on the sidewalk and saw a man carrying a purse disappear among the houses to the north, on the west side of Lake Avenue. A 1954 Oldsmobile with license JXK 620 was parked on Belvidere in the first block west of Lake. The motorist noted the license number of the parked car, and observed a man walk around the car and raise the hood. Except for these people, the street was quiet and empty. A neighbor who heard the victim scream looked out of her house and saw a man with white

shoes running west on Belvidere. The motorist notified the police. Barker and Saxton were apprehended at 12:12 a.m., while they were driving the car with the JXK 620 plates approximately a mile and a half from the site of the robbery. This automobile was registered in the name of Mary Barker. The victim was able to give only a very general description of her attacker. She did testify that he wore shoes like the white, rubber-soled athletic shoes which Barker was wearing at the time of his arrest.

During the course of the trial, both defendants testified. Each denied taking any part in the robbery. Both testified that Barker's car had been loaned to Saxton for the evening, and that Saxton had picked up Barker some time after 11:30 p.m. Saxton said that before he picked up Barker he had had to stop the car for motor trouble, but didn't know where this had occurred.

On the third day of the trial, after the People had completed their rebuttal evidence, appellant Barker was called back to the witness stand by his own attorney and was asked about a conversation he had had with Saxton. There was an objection, and then a conference at the bench in which the court was informed that Barker was about to testify to a confession made by Saxton. A few moments later counsel for Saxton informed the court that his client desired to change his plea. Thereupon, Saxton was rearraigned for plea and pleaded guilty. In answer to the prosecutor's questions, he stated that he had discussed the matter with his counsel and that he was pleading guilty voluntarily because he believed he was guilty.

Appellant Barker then called Saxton as his next witness. The record shows the following: "Q. [by Mr. Most, attorney for appellant Barker] Mr. Saxton, calling your attention to the evening of October 1st, when you committed this robbery of Miss Diehl, was Mr. Barker with you? A. No, he wasn't. THE COURT: Hold your answer. MR. SCHOENHEIT [attorney for defendant Saxton]: I move to strike that for the purpose— THE COURT: The answer may go out. MR. SCHOENHEIT: The witness has been advised that he needn't answer on the ground that he might tend to incriminate himself. THE COURT: Mr. Saxton, you have testified previously in this case and while you can't be held on the robbery charge, so far as any further statement that you might make is concerned, there is a possibility that you could be charged with perjury, and I am going to admonish you and advise you that you shouldn't answer any questions at this time. You should stand on your con-

stitutional rights, that any answers that you give may be self-incriminating. On that advice, do you refuse to answer the questions? THE WITNESS: No, your Honor. I will go ahead and answer the questions. THE COURT: I am not going to let him answer. MR. CARR [prosecutor]: I was going to move that the Court advise the jury that any answer that this witness has given, that he gave to the question despite the interruption, that the jury be advised to disregard and not consider it for any purpose whatsoever. THE COURT: I will so advise them. MR. MOST: I take it your Honor is ruling— THE COURT: I don't think this witness should testify under the circumstances, Mr. Most. He stands here liable to a perjury charge now. I think he ought to stand on his constitutional rights. I think it is the duty of the Court to so advise him and not let him testify.''

The court then stated that the witness would be allowed to answer questions which would not have a tendency to incriminate him. After a few questions had been answered, this occurred: ''Q. [by Mr. Most] Mr. Saxton, I will show you a pair of tennis shoes and ask you whether you recognize these shoes as yours? MR. CARR: Just a minute. I think he should advise him— if your Honor recalls, this witness testified on his examination that he was wearing black shoes— THE COURT: I am going to advise this witness not to answer any more questions. I am not going to draw a fine line in order to determine what is going to be incriminating and what isn't incriminating against this defendant. It is an impossible task at this point. I am going to advise you not to answer any more questions at all. MR. MOST: May we approach the bench, your Honor? THE COURT: It isn't necessary. I don't think this defendant should testify at all any more.''

The net effect of the court's rulings was to prohibit absolutely any testimony from a witness who claimed to have positive knowledge that appellant was not present at the robbery.

██ A witness does not become incompetent to testify merely because his testimony will incriminate him. The privilege against self-incrimination is a purely personal privilege, solely for the benefit of the witness, which he may waive if he wishes. (*Rogers* v. *United States,* 340 U.S. 367, 370 [71 S.Ct. 438, 95 L.Ed. 344, 347, 19 A.L.R.2d 378]; *Steinmetz* v. *California State Board of Education,* 44 Cal.2d 816, 824 [285 P.2d 617].) ██ Neither the state nor any other litigant is entitled to insist that the testimony of the witness be excluded if the witness himself does not claim the privilege. (*People* v. *Lewis,*

222 Cal.App.2d 136, 146 [35 Cal.Rptr. 1]; *People* v. *Mann,* 148 Cal.App.2d 851, 852 [307 P.2d 684].)

When it appears that a witness is about to incriminate himself, the court is fully justified in advising the witness of his privilege and of the possible consequences of his testimony. (See *People* v. *Witt,* 159 Cal.App.2d 492, 497 [324 P.2d 79].)

Where the defendant in a criminal case is about to take the witness stand, it is the duty of the court to make certain that the defendant is fully advised of his privilege. (*People* v. *Kramer,* 227 Cal.App.2d 199 [38 Cal.Rptr. 487]; *Kill-patrick* v. *Superior Court,* 153 Cal.App.2d 146 [314 P.2d 164].) But nothing in those cases suggests that it is proper for the trial judge to forbid a witness to answer incriminating questions if the witness is willing to answer, understanding that he is not compelled to do so. There is no policy of the law which would prevent a perjurer from recanting his false testimony in time to aid another, even though this course exposes the witness to some risk of further prosecution. It is not inconceivable that a witness who had committed perjury would be willing to confess it and accept the consequences rather than to see an innocent friend convicted of a robbery which he did not commit.

In forbidding Saxton to testify on behalf of appellant, the trial court did not indicate any doubt that Saxton had been fully advised or that he was competent to waive his privilege. If the court had entertained any such doubts, it could readily have discussed the subject further with the witness or allowed time for further consultation between the witness and his counsel. The record is clear that the trial judge determined that the court should make the decision for the witness and should protect the witness against his own willingness to testify.

The policy of protecting a witness by forbidding him to confess perjury could have the effect of convicting an innocent man on the basis of false testimony. Beyond making certain that the witness understands what he is doing, the trial court should not deprive a defendant of the benefit of the retraction. This is not to indicate any opinion as to the truth or falsity of anything Saxton said or proposed to say, for neither this court nor the trial court has any certain knowledge of those matters. It was for the trier of fact to decide which version of the facts to accept as true for the purpose of this case.

We do not overlook the argument of the Attorney

General that the ruling could not have been prejudicial because, in the light of the other evidence in the case, the jury would never have believed that Saxton was the man who snatched the purse. This court has no way of knowing what persuasive explanation Saxton might have given if the court had allowed him to change his story. The court's refusal to allow the jury to hear and consider direct testimony as to appellant's nonparticipation must be regarded as prejudicial in the context of this trial.

The judgment is reversed.

Jefferson, J., and Kingsley, J., concurred.