[Crim. No. 16397. First Dist., Div. Four. Aug. 17, 1978.]

THE PEOPLE, Plaintiff and Respondent, v.
LOUIS PAUL SOLOMOS, JR., Defendant and Appellant.

**COUNSEL**

Paul N. Halvonik and Quin Denvir, State Public Defenders, under appointment by the Court of Appeal, Clifton R. Jeffers, Chief Assistant State Public Defender, and Michael G. Millman, Deputy State Public Defender, for Defendant and Appellant.

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, Edward P. O'Brien, Assistant Attorney General, William D. Stein, W. Eric Collins and Nathan D. Mihara, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**PAIK, J.**\*—Defendant-appellant Louis Paul Solomos (hereafter appellant) appeals from a judgment of conviction following a jury verdict finding him guilty of violating Penal Code section 484 (grand theft auto). Issues involve the validity of appellant's waiver of counsel, the propriety of certain jury instructions, the failure of the court to advise appellant of his constitutional privilege not to testify at his own trial and irregularities in the sentencing procedure in violation of Penal Code sections 1200 and 1203, subdivision (b).

On January 5, 1976, a man identified by two witnesses as appellant, walked onto the lot of Bob Schiro Motors in Santa Clara, California. Robert Frost, a salesman at Bob Schiro, testified that appellant asked to be shown a 1966 maroon Corvette. Frost allowed appellant to inspect the vehicle, after which appellant thanked him and walked away. About 20 minutes later, appellant returned and asked another salesman, Howard Higgins, to show him the same car. Higgins testified that appellant asked if he could hear the engine run. Higgins said "Sure, go ahead and start it up" and gave him the keys. Just then Higgins was summoned into the office to receive a phone call. As he was speaking on the phone, Higgins noticed the car start to pull out. He hung up the phone and ran outside, yelling to appellant to "hold on," but appellant drove away. Frost attempted to follow the maroon Corvette in another car, but abandoned the chase when he noticed that his car was nearly out of gas.

Three days later John Sherrard, a trooper for the Washington State Highway Patrol, stopped appellant for speeding on Interstate 5 northbound. Appellant was driving a maroon Corvette with Texas license plates. At Sherrard's request, appellant showed him a Texas registration which matched the license plates. Sherrard then approached the passenger side of the vehicle in order to observe the public vehicle identification (hereafter also VIN) number located underneath the

---

*Assigned by the Chairperson of the Judicial Council.

glove compartment. Noticing that the number was not readily readable, Sherrard rubbed the I.D. plate and observed fresh black paint come off on his thumb. Sherrard thereupon obtained appellant's consent to impound the vehicle for purposes of positive identification. Sherrard checked the secondary VIN number and found it to be different from the public VIN number. A computer check of the secondary number revealed that it corresponded to a 1966 Corvette that had been reported stolen in Santa Clara. Appellant was placed under arrest for possession of a stolen vehicle. A search of the car revealed, among other things, a can of black enamel spray paint, some sandpaper, and two books listing the prices and values of various vehicles.

Appellant was extradited to California in early March 1976. An information charging him with one count of grand theft auto and one count of unlawful taking or driving of a vehicle was filed on March 30, 1976.

At the arraignment, the deputy public defender moved to withdraw as attorney of record because appellant was financially ineligible. When asked by the court if he had money to hire a lawyer, appellant explained that he did not wish to hire an attorney, but rather to "represent myself and stand mute on the charge." When appellant persisted in his desire to represent himself, the court appointed a psychiatrist to examine appellant to determine if he was mentally competent to do so. The psychiatrist's report concluded that appellant was "emotionally and intellectually capable" of presenting his own defense.

On May 11, 1976, appellant appeared before the trial judge and was again queried on his decision to act as his own attorney. Appellant explained that he was dissatisfied with the representation he received by the deputy public defender at the preliminary hearing. Appellant was unmoved by warnings that he faced serious charges and should receive the assistance of an attorney, stating "I'm going to have to get my feet wet sometime, Your Honor. I've got to try."

The case was tried with appellant representing himself before the jury. Appellant took the stand and denied stealing the Corvette, claiming that the car was obtained lawfully from a private party in San Antonio, Texas for $1,500. He flatly denied ever having been to Bob Schiro Motors and claimed to have been just west of Denver on the date of the theft. He stated that the discrepancy in the VIN numbers was explainable, since in the State of Texas, when an inoperable car is taken to a junkyard, the

dealer is given a "Certificate of Salvage Title" with only a brief description of the car and the identification numbers. Appellant explained that the car could have been in an accident, repaired in a junkyard and the identification numbers legally altered or removed, for in Texas the VIN numbers do not have to be the original numbers issued to the vehicle at the time of production. In rebuttal, Officer Sherrard was called to the stand and testified that while such a "salvage" vehicle could receive a different VIN number, the number assigned would have to be a new number and not the number of another existing vehicle.

The jury found appellant guilty of grand theft of the automobile. At the posttrial hearing, a private attorney appeared to argue a motion for new trial on appellant's behalf. However, appellant stated that this procedure was against his wishes, and the attorney was relieved. Appellant stated that he did not want an attorney and did not want to represent himself, but would do "nothing." He was then sentenced to state prison for the term prescribed by law.

Appellant's first contention is that he did not "voluntarily and unequivocally" waive his right to counsel, since he expressed confusion and made certain statements indicating a desire for the assistance of an attorney; hence, that the trial court improperly allowed him to represent himself at trial, depriving him of his Sixth Amendment rights.

In *Faretta* v. *California* (1975) 422 U.S. 806 [45 L.Ed.2d 562, 95 S.Ct. 2525], the United States Supreme Court held that a defendant in a criminal case has the constitutional right to represent himself at trial. The California Supreme Court, interpreting *Faretta,* has held that when a demand for self-representation is timely interposed, the trial court must permit a defendant to represent himself upon ascertaining that he has voluntarily and intelligently elected to do so. (*People* v. *Windham* (1977) 19 Cal.3d 121, 128 [137 Cal.Rptr. 8, 560 P.2d 1187].) These principles were scrupulously followed by the trial court. Upon learning that appellant wished to represent himself, the judge at the arraignment warned the defendant that he was facing charges that could send him to prison for 10 or 15 years; the judge also told appellant that he needed a lawyer, and that if appellant did not have sufficient funds, the court would appoint one. When appellant repeated his desire for self-representation, the judge ascertained that appellant was literate, and appointed a psychiatrist to report on his mental competence. The psychiatrist submitted a favorable report and appellant was permitted to proceed without counsel. Prior to trial, the court asked appellant if he was

sure he wished to represent himself. The prosecutor added that if appellant chose to represent himself, he would be subject to the same rules as an attorney and would receive no special treatment. Appellant indicated that he nonetheless wished to act as his own attorney, and he was allowed to do so.

Appellant contends that his statements show he was confused, and perhaps disposed to representation by a competent attorney. He then argues that the case of *People* v. *Marsden* (1970) 2 Cal.3d 118 [84 Cal.Rptr. 156, 465 P.2d 44] mandates that the trial judge should have conducted a more thorough inquiry into the source of appellant's dissatisfaction with appointed counsel, rather than "abruptly" concluding that he would represent himself. In *Marsden, supra,* the California Supreme Court ruled that a trial court committed reversible error by refusing to permit a defendant to explain his reasons for a motion to *discharge* his appointed counsel. (2 Cal.3d at p. 123.) In the instant case, appellant did not seek to discharge his attorney. When the deputy public defender moved to withdraw from the case because appellant was financially ineligible, appellant was asked if he wished to hire a lawyer. He responded: "I don't wish to hire an attorney." After warning him of the dangers and asking appellant whether he wished the court to provide him with a lawyer, appellant responded, "Not at this time." The court then directly asked, "Do you want to represent yourself?" and appellant answered "Yes."

At that point the sole issue to be determined by the court was whether appellant had the mental capacity to waive his constitutional right to counsel with a realization of the probable risks and consequences of his action. (*Curry* v. *Superior Court* (1977) 75 Cal.App.3d 221, 226-227 [141 Cal.Rptr. 884].) ■ The court was under no duty to explore appellant's underlying reasons for his action, although in fact appellant did later explain that he was dissatisfied by the representation he received at the preliminary hearing and indicated that he preferred to personally cross-examine the two chief witnesses against him. This case falls squarely within the facts and holding of *People* v. *Wright* (1977) 72 Cal.App.3d 328 [140 Cal.Rptr. 98]. The Court of Appeal there rejected the very claim presented here, i.e., that where a defendant demands his constitutional right to self-representation the trial court must conduct a *Marsden*-type inquiry as to why appointed counsel would not be more preferable. "The colloquy between trial judge and defendant establishes, without question, that defendant was warned of the danger and pitfalls he would likely encounter if he represented himself. To this warning by the

trial judge, defendant replied that he was willing to risk his freedom on his own ability rather than on the ability of experienced counsel. [¶] Having chosen the constitutional right of self-representation and, not having made any effort to change back to counsel representation as the trial proceedings progressed, defendant cannot be heard on appeal to assert that, in representing himself, he received ineffective or inadequate representation. A '[d]efendant's contention that he inadequately or ineffectively represented himself cannot be urged or sustained on appeal once he has elected to "shoot craps" in the trial court and appear in propria persona.' [Citations.]" (*Id.*, at p. 340.)

 Appellate counsel claims that this case is distinguishable from *Wright* in that here, appellant's request for self-representation was "equivocal." We find no such equivocation. The record is replete with firm statements by appellant that he wished to act as his own attorney. Counsel cites that portion of the transcript where appellant states, "If I had an attorney to represent me, it would be one thing, but I don't feel that any attorney will represent me" and "I would speak to [the deputy public defender] if he would come, but I will not just hire the first attorney that comes in the door," as indicative of appellant's desire for representation. It is clear from the entire context of the colloquy that appellant was simply expressing his distrust for attorneys in general. As stated in the psychiatrist's report, "Since he can obtain no assistance from the legal profession to his satisfaction, he proposes to present his own defense." Given appellant's repeated affirmations that he wished to act as his own attorney and the psychiatrist's report concluding that he had the emotional and intellectual capability of making such a decision, the lower court's action was in full compliance with *Faretta.* Appellant's waiver of counsel was valid.[1]

Appellant next contends that the trial court erred in permitting him to testify in his own defense without advising him of his Fifth Amendment privilege against self-incrimination. We agree.

After the prosecution rested its case, the following dialogue ensued: "THE COURT: Mr. Solomos, are you going to call any witnesses, sir? MR.

---

[1]Appellant also cites the dialogue at the arraignment where the judge stated that he would "appoint an attorney to assist you if you want," and appellant responded, "I would like that." However, after being informed he would be charged for these services, appellant withdrew his request. Clearly, these statements do not indicate that appellant had changed his mind about representing himself. He merely declined the *assistance* of legal counsel if he were forced to pay for it. Notably, appellant was in fact allowed to confer with an attorney from the public defender's office prior to trial.

SOLOMOS: Yes. THE COURT: All right. Do you want to proceed then? MR. SOLOMOS: Me. THE COURT: All right. You're going to testify," whereupon appellant proceeded to testify on his own behalf.

■ Although it has been held that a defendant who is represented by counsel waives his privilege not to testify if he voluntarily takes the stand (e.g., *People* v. *Huerta* (1957) 148 Cal.App.2d 272, 274 [306 P.2d 505]) the same rule does not apply where the defendant proceeds in propria persona. This is because in the latter case, it cannot be presumed that the defendant was aware of his Fifth Amendment privilege. As stated in *People* v. *Kramer* (1964) 227 Cal.App.2d 199 [38 Cal.Rptr. 487]: " 'where the record clearly shows that the accused was not informed of his constitutional and statutory privilege not to testify . . . , his voluntary action in testifying would not, under the circumstances constitute a waiver of his privilege. In order to waive a privilege, it must be an act based upon knowledge and intelligent choice. Since the accused was not so advised, nor has it been shown that he was possessed of the knowledge of his privilege, we are forced to the conclusion that his act in testifying was in ignorance of his right not to do so.' " (*Id.,* at p. 202, quoting from *Cochran* v. *State* (Fla. 1960) 117 So.2d 544, 547 [79 A.L.R.2d 638].)

Subsequent California cases have recognized the principle that permitting a defendant who is not represented by counsel to testify on his own behalf without advising him of his right not to testify constitutes error of constitutional dimensions. (*People* v. *Glaser* (1965) 238 Cal.App.2d 819, 828-829 [48 Cal.Rptr. 427]; *People* v. *Wells* (1968) 261 Cal.App.2d 468, 481 [68 Cal.Rptr. 400]; *People* v. *Thomas* (1974) 43 Cal.App.3d 862, 867-868 [118 Cal.Rptr. 226]; *People* v. *Barker* (1965) 232 Cal.App.2d 178, 182 [42 Cal.Rptr. 651].)

The People argue that such a warning was not necessary in the instant case because (1) by assuming his own defense under *Faretta, supra,* appellant waived his Fifth Amendment right; (2) appellant had been involved in criminal proceedings in Washington and had been read his *Miranda* rights by the Washington State Highway Patrol; and (3) appellant had been represented by and conferred with counsel prior to trial.

None of these arguments are convincing. Appellant's choice to act as his own attorney under *Faretta, supra,* although amounting to a waiver of his Sixth Amendment right to counsel, cannot affect his Fifth Amendment privilege not to testify. Furthermore, it would be

inappropriate to assume that appellant, who had no prior criminal record and had simply pleaded guilty to a speeding charge in Washington, could reasonably have been aware of a constitutional right not to testify at his own trial. It is well established that the record must affirmatively show an informed and intelligent waiver of a constitutional right. (*Carnley* v. *Cochran* (1962) 369 U.S. 506, 514 [8 L.Ed.2d 70, 76, 82 S.Ct. 884]; *In re Johnson* (1965) 62 Cal.2d 325, 334 [42 Cal.Rptr. 228, 398 P.2d 420].) We are not permitted to speculate as to what may have transpired off the record in the area of constitutional rights. (See *People* v. *Wells, supra,* 261 Cal.App.2d 468, 481.)

Having concluded that error occurred, we must determine the standard for reversal. In *Kramer, supra,* 227 Cal.App.2d 199 and *Killpatrick* v. *Superior Court* (1957) 153 Cal.App.2d 146 [314 P.2d 164], the appellate courts concluded that the court's failure to advise a defendant in pro. per. of his constitutional right not to testify at his own trial amounts to the denial of an "essential element of a fair trial or due process" and the error was reversible per se. (153 Cal.App.2d at p. 151; 227 Cal.App.2d at p. 203; see also Witkin, Cal. Criminal Procedure (1963) § 761, (1978 supp.) § 769, p. 1066.) However, in *People* v. *Wells, supra,* the court simply employed the *Chapman* test of "harmless beyond a reasonable doubt" which is ordinarily applied in cases of constitutional error not amounting to a denial of due process. (261 Cal.App.2d at p. 481; see *Chapman* v. *California* (1967) 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824, 24 A.L.R.3d 1065]; *People* v. *Spencer* (1967) 66 Cal.2d 158, 168 [57 Cal.Rptr. 163, 424 P.2d 715].)[2]

■ Under *Kramer* and *Killpatrick,* the defendant's right not to testify at his own trial is one of the most basic and fundamental rights guaranteed by the United States and California Constitutions. Where a defendant conducts his defense without the aid of counsel, his choice to waive that right and take the stand on his own behalf must be free and informed. In the absence of a knowledgeable and voluntary waiver, the pro. per. defendant, even after *Faretta,* cannot be said to have had a genuine choice in the matter. Under these circumstances, it must be concluded that the defendant has been denied an essential element of due process. Therefore, the resulting judgment cannot be saved by the

---

[2]The other reported case in which this error occurred, *People* v. *Glaser, supra,* 238 Cal.App.2d 819, apparently recognized the "reversible per se" rule of *Kramer* and *Killpatrick* (*id.,* at pp. 829-830) but held that the defendant could not invoke the rule in a collateral attack upon the judgment. (*Id.,* at pp. 830-831; see *People* v. *Owens* (1977) 66 Cal.App.3d 720, 723 [136 Cal.Rptr. 215].)

fact that the error was not prejudicial. (See *People* v. *Bostick* (1965) 62 Cal.2d 820, 824 [44 Cal.Rptr. 649, 402 P.2d 529].)

■ Even if the *Chapman* test were utilized, we cannot say with certainty that the error was harmless beyond a reasonable doubt. The People argue that such was the case because appellant's testimony "was not incriminating in substance," and presented the jury with substantial issues of fact which only tended to strengthen his cause. This argument ignores several other important considerations.

Appellant's appearance as a witness allowed the prosecution on cross-examination to bring out the fact that appellant had worked at a General Motors assembly plant and knew that each vehicle had a separate identification number as well as the fact that such numbers could be used to trace a stolen car. It also permitted the prosecution to call Sergeant Sherrard in rebuttal, whose testimony was to the effect that there was no accidental way the 1966 Corvette which appellant was driving could have the VIN number of another vehicle. These events permitted the prosecution to shore up considerably its proof of specific intent. When coupled with the fact that appellant chose to tell an improbable alibi story rather than rely on the state of the evidence, such events may well have played a key role in convincing the jury that appellant was guilty of grand theft rather than the lesser included offense of unlawful taking or driving of a vehicle, or auto tampering. Under these circumstances it cannot be said there was *no reasonable possibility* that a verdict more favorable to appellant would have resulted in the absence of the error. (See *People* v. *Ross* (1967) 67 Cal.2d 64, 73-74 [60 Cal.Rptr. 254, 429 P.2d 606].)

Since under either test, the court's failure to advise appellant of his constitutional right not to testify at his own trial warrants reversal of the judgment, the remaining assignments of error need not be considered.

The judgment is reversed.

Caldecott, P. J., and Rattigan, J., concurred.

A petition for a rehearing was denied September 11, 1978, and respondent's petition for a hearing by the Supreme Court was denied October 25, 1978.