104 Cal.Rptr.2d 19 (2001)
86 Cal.App.4th 731
The PEOPLE, Plaintiff and Respondent,
v.
Mark BARNUM, Defendant and Appellant.
No. C031302.
Court of Appeal, Third District.
January 29, 2001.
Review Granted April 18, 2001.
*21 Fern M. Laethem, State Public Defender, under appointment by the Court of Appeal, Arnold Erickson and David S. Adams, Deputy States Public Defender, for Defendant and Appellant.
Bill Lockyer, Attorney General, David P. Druliner, Chief Assistant Attorney General, Robert R. Anderson, Senior Assistant Attorney General, Margaret Venturi and Clifford E. Zall, Deputy Attorneys General, for Plaintiff and Respondent.
Certified for Partial Publication.[*]
*20 MORRISON, J.
A jury convicted defendant of battery by an inmate on a noninmate and resisting an executive officer with force, and found true four prior convictions under the Three Strikes law. (Pen.Code, §§ 4501.5, 69, 667, subds.(b)-(i).)
In the published portion of this opinion we hold the fact a trial was conducted in a state prison does not, of itself, establish the trial was unfair. We also conclude a trial court need not advise a self-represented defendant about his right not to testify. In the unpublished portion, we reject defendant's other contentions of error. We shall affirm.

FACTS
The main issue at trial was whether guards acted properly when they took defendant from his cell, or acted with excessive force, which gave defendant and his cellmate the right to defend themselves. The cellmate pleaded guilty.
Officers John Cartier and Richard Eubanks had recently been assigned to the *22 building in which defendant was housed and the prior guards had not regularly inspected the cells for contraband. Cartier and Eubanks began searching several cells each evening after dinner, sweeping the building clean, so they could then institute regular, random, cell searches. On July 19, 1997, they selected the cell shared by defendant and inmate Hendricks. Defendant had a reputation as a hothead, so they called Officer Lorenzo Abella from another building. After the officers got defendant and Hendricks out of the cell, defendant began swearing. He approached Cartier, who put his hand up to keep defendant at bay. Defendant "moved in" to Carrier's hand, then slapped it away. When Cartier tried to handcuff defendant, a fight erupted in which Carrier's throat was scratched and Abella's head was slammed into a rail, after which defendant and Hendricks pummeled Abella's back until Eubanks sprayed them with a chemical.
Defendant elicited from a sergeant that Abella, apparently, left his post to assist the search, and showed the officer who investigated the matter did not interview any inmates. He elicited testimony from prisoners (including himself) that, if believed, showed his cell was selected in retaliation for a squabble which occurred during dinner, in which a guard belittled a dead rap music artist and, in reply, a prisoner belittled John Wayne. Some claimed the guards employed excessive force.
The prosecution impeached the prisoners with their prior convictions and pointed out implausibilities in their stories.
The jury returned the following note: "We, the Jury believe that Mr. Mark Barnum is guilty on both counts. However, we also believe that the events were precip[it]ated by improper handling of prec[eding] events and could have been prevented by the following of proper established protocols."

DISCUSSION

I
Defendant's primary contention of error is the trial should not have been conducted on the grounds of a state prison.
Defendant does not show prejudice. "No judgment shall be set aside ... for any error as to any matter of pleading, or for any error as to any matter of procedure, unless, after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice." (Cal. Const., art. VI, § 13.)
This case presented a credibility contest, centered on whether the guards acted lawfully or provoked the inmates. The location of the trial did not necessarily change anything. The jury was going to learn defendant was an inmate.
Counsel presents several snippets from the relevant section of the California Standards of Judicial Administration in an effort to bolster his case. However, when the full section is consulted, it does not aid defendant.
We set out the relevant section in full:
"(a) Facilities used regularly for judicial proceedings should not be located on the grounds of or immediately adjacent to a state penal institution unless the location, design and setting of the court facility provide adequate protection against the possible adverse influence that the prison facilities and activities might have upon the fairness of judicial proceedings. In determining whether adequate protection is provided, the following factors should be considered: (1) the physical and visual remoteness of the court facility from the facilities and activities of the prison; (2) the location and appearance of the court facility with respect to the adjacent public areas through which jurors and witnesses would normally travel in going to and from the court; (3) the accessibility of the facility to the press and the general public; and (4) any other factors that might affect the *23 fairness of the judicial proceedings, "(b) Unless the location, design and setting of the facility for conducting court sessions meet the criteria established in subdivision (a): (1) court sessions should not be conducted in or immediately adjacent to a state penal institution except for compelling reasons of safety or convenience of the court, and (2) should not be conducted at such a location in any event when the trial is by jury, or when the testimony of witnesses who are neither inmates nor employees of the institution will be required." (Cal. Stds. of Jud. Admin., § 7.5 (hereafter § 7.5).)
The Judicial Council has not expressed a preference that prisons not be used as courthouses, only that adequate safeguards be employed when they are so used. Because we presume official duty is performed (Evid.Code, § 664), and because the record does not demonstrate otherwise, we presume all proper steps were taken in accordance with section 7.5, including ensuring accessibility to the public and press and ensuring "the location, design and setting of the court facility provide adequate protection against the possible adverse influence that the prison facilities and activities might have upon the fairness of judicial proceedings."
Counsel states the trial court, ruled the trial would not be in the prison, but then mysteriously and off the record changed its mind. The record citation supplied in support of this assertion is to a pretrial hearing brought in multiple cases, regarding the policy of denying contact attorney visits to prisoners in administrative segregation. The court denied the motion, but did order "private consultation." The court went on, in an aside, and stated "as I said, I sympathize with counsel. I realize I'm not dealing with an unusual situation, even though we are here hearing this hearing on the grounds of High Desert State Prison, and [in] many cases, that will be deemed prejudicial itself, we will not have a trial here. [¶] But under the circumstances, that will be the ruling, [on visits]." The court did not rule "we will not have a trial here," meaning, in this case. The court was saying that in "many cases, that will be deemed prejudicial itself," and in such cases "we will not have a trial" in the prison.
We granted defendant's request for judicial notice of an order of the Presiding Judge of the Lassen County Superior Court. It states: "Upon the application of the Superior Court, the Judicial Council and Administrative Office of the Courts of the State of California have found justified the assignment of a judge to the court to preside over `Three Strikes' trials as assigned by this court; and this court has found it in the public interest to provide for a regular extra session of the Superior Court for [t]his purpose as authorized by law (Government Code 69790[).]" These sessions are to be known as Department Five, "to which are apportioned the criminal cases pending before the court, commonly known as `strike' cases, which arise from alleged acts occurring in a facility of the State Department of Corrections in Lassen County." Such cases are to be heard either "at the court facility located on the grounds of High Desert State Prison (Government Code sections 69741(b) and 69792,) or, as the same may be available and directed by the Presiding Judge, the main Courthouse in the City of Susanville."
Only "strike" cases are subject to this rule, and they are the cases posing the greatest security threats, as a class. On its face the order does not state that all such cases are to be heard in prison. If a defendant can articulate prejudice to his case, presumably the trial court will not employ this rule, or at least the defendant will have made a record of the problem, thus preserving it for appellate review. This defendant did neither.
To the extent we interpret defendant's brief as making an argument for per se reversal whenever a trial is conducted on prison grounds, the authorities cited in support of such claim do not withstand *24 scrutiny. As the trial court indicated in the ruling just discussed, it is sometimes, but not always, prejudicial to conduct a trial on prison grounds. Therefore each case must be considered on its facts. For the reasons stated above, we assume all reasonable steps to minimize any unfairness were taken in this case, therefore defendant's claim fails. We briefly discuss some of the authorities mentioned by counsel, to refute the claim of a "per se" rule of prejudice.
Another panel of this court recently rejected an attack on the practice of holding certain trials within the confines of the Susanville Prison. (See People v. England (2000) 83 Cal.App.4th 772, 100 Cal.Rptr.2d 63.) We generally agree with that decision.
Other courts have considered this issue, often focusing on public access to the trial. (E.g., Bright v. State (Ct.App.Alaska 1994) 875 P.2d 100,102-105,107-110 [over objection, assault case held in prison, no showing of compelling reasons, federal and state right to public trial violated]; Vescuso v. Commonwealth (1987) 5 Va.App. 59, 68-69 [360 S.E.2d 547, 550-551] [no categorical ban on prison trials, but presumption is they deny public access]; see Annot., Exclusion of Public from State Criminal Trial by Conducting Trial or Part Thereof at Other than Regular Place or Time (1989) 70 A.L.R.4th 632; Annot., Place of Holding Sessions of Trial Court as Affecting Validity of its Proceedings (1968) 18 A.L.R.3d 572.) As stated above, for lack of a record showing otherwise, we presume the public and press had reasonable means of attending trial. (See § 7.5(a); see also People v. England, supra, 83 Cal.App.4th at pp. 778-779,100 Cal.Rptr.2d 63.)
Defendant analogizes to cases of unnecessary shackling of a prisoner, or dressing a prisoner in jail clothing, which may unfairly convey to the jury the suggestion the accused is dangerous and, hence, probably guilty. In a Virginia case, the accused claimed holding his trial in the prison created an atmosphere that implicitly communicated his dangerousness and guilt to the jurors. The accused had asked that the trial not take place in the prison, and the record contained a description of the trial surroundings, including a view of "gun towers, bayonet wire, bars, and security fences;" however, the Virginia Court of Appeals concluded "the trial location did not erode Howard's right to a presumption of innocence." (Howard v. Commonwealth (1988) 6 Va.App. 132, 137-140, 367 S.E.2d 527, 530-532 (Howard ).) The analysis focused on the precise layout of the courtroom and prison which is not described in this record.
Defendant's primary authority is State v. Lane (1979) 60 Ohio St.2d 112, 397 N.E.2d 1338, but the case is inapposite: "In [Lane], the court found that the defendants were denied a fair trial because they were tried in a makeshift courtroom located within the prison itself, where the jurors had a `constant view of the scene of the alleged offense [escape].' [Citation.] Further, the court found that the right of the defendant to call witnesses was chilled by the location of the trial and cited the fact that several inmate witnesses had refused to testify in the penitentiary courtroom for fear of reprisal by prison officials." (Howard, supra, 6 Va.App. at pp. 139-140, 367 S.E.2d at p. 532.) None of the prejudicial points in Lane are present.
Lest it appear we are burying our heads in the sand, we point out, as other courts have repeatedly explained, that our system of laws depends upon the assumption that jurors are intelligent. (See People v. Powell (1960) 186 Cal.App.2d 54, 59, 8 Cal.Rptr. 707.) "A juror is not some kind of dithering nincompoop, brought in from never-never land and exposed to the harsh realities of life for the first time in the jury box." (People v. Long (1974) 38 Cal.App.3d 680, 689, 113 Cal.Rptr. 530.) At most, given the inmate-witnesses were in the highest security status (level IV, administrative segregation) the jury undoubtedly (and correctly) concluded an in-prison trial was just standard operating procedure, having no particular application to this defendant. Lassen County is not very large and the *25 prisons there are among the largest local operations. Very likely the practice of inprison trials is widely known and understood among the populace. In fact, defendant was not visibly shackled in this case and the trial judge commended him for being such a gentleman at trial, despite the view of the guards that he was a dangerous hothead. We decline to infer the jury would likely conclude defendant was guilty because the trial occurred inside a state prison, thereby disregarding their instructions and common sense. Moreover, the jurors reacted favorably to the defendant as shown by the gratuitous appendage to their verdict.
Two recent California Supreme Court cases are instructive. In People v. Jenkins (2000) 22 Cal.4th 900, 95 Cal.Rptr.2d 377, 997 P.2d 1044, the defendant claimed the trial court should not have installed a metal detector at the courtroom door. The court (at page 996, 95 Cal.Rptr.2d 377, 997 P.2d 1044) distinguished measures which mark the defendant as dangerous: "Unlike shackling and the display of the defendant in jail garb, the use of a metal detector does not identify the defendant as a person apart or as worthy of fear and suspicion." In another case the court pointed out "To the extent the metal detector's use focused attention on the proceedings, it pointed to the nature of the case, not to defendant's character." (People v. Ayala (2000) 23 Cal.4th 225, 252, 96 Cal.Rptr.2d 682, 1 P.3d 3.) The location of trial did not mark defendant. For this reason, no hearing was required on the issue. (People v. Jenkins, supra, 22 Cal.4th at p. 997, 95 Cal.Rptr.2d 377, 997 P.2d 1044; see Holbrook v. Flynn (1986) 475 U.S. 560, 568-569, 106 S.Ct. 1340, 89 L.Ed.2d 525, 534-535.)
For the same reasons, the court had no duty to instruct the jury on its own motion not to infer anything about guilt due to the location of the trial. Defendant likens the problem to the need to instruct jurors not to visit crime scenes, but the analogy is weak. The standard instructions focus the jury's attention on the facts of the alleged crime. "[I]t is a fundamental and historic precept of our judicial system that jurors are restricted solely to the determination of factual questions and are bound by the law as given them by the court[.]" (Noll v. Lee (1963) 221 Cal.App.2d 81, 87, 34 Cal.Rptr. 223, original italics.) There is no basis to infer defendant was convicted because the trial occurred inside a state prison; instead, the evidence showed he was guilty. If defendant wanted an instruction on the point, he should have requested one.
Finally, we observe that an in-prison trial can benefit a defendant who would otherwise have to be shackled. The probation report reflects defendant has a violent history, including violence toward officers, convictions for dissuading witnesses, and racially motivated threats. In response to the motion for a contact visit, Associate Warden Salvatore Mennuti filed a declaration stating most of the inmates at High Desert Prison are level IV inmates, who "are assigned to only the most secure facilities with the greatest amount of armed coverage. Level TV inmates require a greater amount of supervision than other inmates since they present a higher risk of violence or escape." But even within this set of dangerous inmates there exists those, such as defendant, who are housed in an administrative segregation unit (ASU), which "is made up primarily of Level IV inmates who have been segregated from other Level IV inmates because they pose a threat to the security of [the] institution." (See Small v. Superior Court (2000) 79 Cal.App.4th 1000, 1005, 94 Cal. Rptr.2d 550.) As the trial date approached, a security officer who had witnessed defendant's in-court behavior recommended the use of "a stun-belt for the safety of the public and the court staff."
Defendant was a prime candidate for shackling, both because of his status as an ASU inmate and given the particulars of his history of disobedience and violence against those in authority. The trial court ruled no stun belt or visible shackles were *26 to be used. Had the trial been conducted in Susanville, instead of in the prison, defendant's flight and violence risks would have been weighed quite differently.
This illustrates that the selective use of in-prison trials is beneficial to the State, the taxpayer and, in some cases, the defendant. It is not an inherently prejudicial practice.

II
Although the trial court believed defendant was manipulating the system, it granted defendant's request during jury selection to represent himself, after defendant's request for new appointed counsel was denied. Defendant complains the trial court failed to advise him of his right not to testify.
"Kramer" error consists of failure by a trial court to warn an unrepresented defendant of his right not to testify. (People v. Kramer (1964) 227 Cal.App.2d 199, 38 Cal.Rptr. 487.) This followed the Killpatrick decision (Killpatrick v. Superior Court (1957) 153 Cal.App.2d 146, 314 P.2d 164) which concluded a prosecutor could not call an unrepresented defendant to the stand. Defendant maintains both Kramer and Killpatrick error occurred in this case. The People contend no error occurred. We agree with the People.
Defendant represented himself. The trial court did not advise him of his right not to testify. Nor does the record show whether or not his advisory counsel so advised him, and we express no view on the duties of advisory counsel in this case. Defendant took the stand, testified in his defense and was cross-examined. The People later called defendant as a rebuttal witness, without objection. Defendant gave a narrative cross-examination of himself in reply to the rebuttal.
We have no quarrel with the premise that a defendant has a constitutional right not to testify. (U.S. Const., Amends. V & XIV; Cal. Const., art. I, § 15.) Kramer held an unrepresented defendant must be told he has the right not to take the stand. This holding was based on the theory that, while taking the stand ordinarily waives the privilege against self-incrimination (see 2 Witkin, Cal. Evidence (4th ed. 2000) Witnesses, § 498, p. 805), where a defendant has no counsel, it cannot be assumed any such waiver was knowing and voluntary. (Kramer, supra, 227 Cal.App.2d at pp. 201-203, 38 Cal. Rptr. 487.) Because waivers of constitutional rights must be knowing and voluntary (see Godinez v. Moran (1993) 509 U.S. 389, 400, 113 S.Ct. 2680, 125 L.Ed.2d 321, 333), Kramer and cases like it conclude unrepresented defendants need and are entitled to legal advice from the trial court about the privilege not to testify. A number of courts have accepted this reasoning. (See People v. Jones (1992) 2 Cal. App.4th 867, 872-873, 3 Cal.Rptr.2d 602 [referring to "well-established authority," citing California appellate cases]; Cochran v. State (1960) 117 So.2d 544, 545-547 [citing Killpatrick and cited by Kramer, lead case in Annot., Duty of Court to Inform Accused Who is Not Represented by Counsel of his Right Not to Testify (1961 & Later Case Service) 79 A.L.R.2d 643]; Martin v. State (1988) 73 Md.App. 597, 598-602 [535 A.2d 951, 952-954] [pointing out rule arose with cases where a trial court directed or invited a defendant to take the stand].) Some California cases cite People v. O'Bryan (1913) 165 Cal. 55, 130 P. 1042, in support of the rule, but there, "it was similarly held that statements of the accused, which had been adduced before the grand jury without advice of the privilege against self-incrimination, should not have been introduced in evidence at his trial or have been used to impeach the defendant when he testified." (People v. Glaser (1965) 238 Cal.App.2d 819, 829, 48 Cal.Rptr. 427.) Excluding statements compelled during a grand jury proceeding is not the same as forcing a trial court to give legal advice. (And see United States v. Wong (1977) 431 U.S. 174, 97 S.Ct. 1823, *27 52 L.Ed.2d 231 [no warning, false grand jury testimony admissible].)
The Kramer line of cases departs from the rule that litigants who chose to appear in court without counsel are not entitled to special privileges. "A defendant who intelligently refuses counsel and insists upon personally conducting and controlling his defense does not lose the status of prisoner and become entitled to extraordinary privileges not accorded defendants who are represented by counsel, nor does he become entitled to proceed in a manner different from that permitted to attorneys." (People v. Chessman (1951) 38 Cal.2d 166, 174, 238 P.2d 1001; see, e.g., People v. Jenkins, supra, 22 Cal.4th 900, 1039, 95 Cal.Rptr.2d 377, 997 P.2d 1044 [defendant no more entitled to a continuance than former attorney had been]; People v. Jones, supra, 2 Cal.App.4th at pp. 873-874, 3 Cal.Rptr.2d 602 [trial court need not advise a defendant to testify]. See 5 Witkin & Epstein, Cal.Criminal Law (3d ed. 2000) Criminal Trial, § 259, p. 399.)
In this case, before granting the Faretta (Faretta v. California (1975) 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562) motion, the trial judge warned defendant he would be treated like an attorney and "I am not going to be able to assist you or advise you on matters of law, evidence or trial practice." This is the law as stated by the California Supreme Court: "[T]he judge ordinarily is not required to assist or advise him on matters of law, evidence or trial practice." (People v. Redmond (1969) 71 Cal.2d 745, 758, 79 Cal.Rptr. 529, 457 P.2d 321.) This quotation is followed by a footnote in which the California Supreme Court gives Kramer, supra, 227 Cal. App.2d 199, 38 Cal.Rptr. 487 as one example of an exception to the rule, but which does not explicitly endorse or approve of Kramer. (Redmond, at p. 758, fn. 3, 79 Cal.Rptr. 529, 457 P.2d 321.)
None of the cases to which we have been directed express a reason for departing from the general rule, except the notion that it is improper to infer a waiver of the privilege against self-incrimination unless a defendant who takes the stand either was represented by counsel or was instructed by the trial court about his right not to take the stand. (E.g., People v. Solomos (1978) 83 Cal.App.3d 945, 953-954, 148 Cal.Rptr. 248 [cursorily rejecting view that Faretta trumps Kramer ]; People v. Cervantes (1978) 87 Cal.App.3d 281, 288-289, 150 Cal.Rptr. 819 [following Solomos ].) We ourselves have previously so held. (People v. Longwith (1981) 125 Cal. App.3d 400, 412, 178 Cal.Rptr. 136 [citing, inter alia, Solomos and Killpatrick ]; People v. Wells (1968) 261 Cal.App.2d 468, 481, 68 Cal.Rptr. 400 [citing, inter alia, Kramer].)
Although a leading California treatise notes the "exception" to the general rule, it makes no effort to analyze or defend it. (5 Witkin & Epstein, supra, § 259, p. 401. See also Criminal Proceedings (CJER 1991) Comencing the Action, § 1.45, pp. 48-49 (1995 supp.) 131.) Indeed, a leading national treatise gives the general rule but states "an exception is made as to notification of the right not to testify; the failure of the trial court to inform the pro se defendant of that right will constitute reversible error, unless it clearly had no bearing on the outcome or defendant was otherwise aware of that right." (3 LaFave et al., Criminal Procedure (2d ed. 1999) Right to Self Representation, § 11(e), p. 586, fn. 77.) In support, LaFave cites an annotation citing three California cases applying Kramer, supra, 227 Cal.App.2d 199, 38 Cal.Rptr. 487 and, in the supplement, another California case and some sisterstate cases. (See Annot., Accused's Right to Represent Himself (1980 & Later Case Service) 98 A.L.R.3d 13, 84-85.) Neither the annotation nor LaFave provide any other reason for the rule except as stated in Kramer and cases following Kramer.
Assuming it was ever a correct statement of the law, the vestigial exception to the rule that a self-represented litigant is *28 not entitled to legal assistance from a trial court makes no sense after the Supreme Court decision in Faretta v. California, supra, 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 in the modern legal universe.
Faretta requires a trial judge to grant self-representation even where a defendant lacks formal education and knowledge in the law. "We need make no assessment of how well or poorly Faretta had mastered the intricacies of the hearsay rule and the California code provisions that govern challenges of potential jurors on voir dire. For his technical legal knowledge, as such, was not relevant to an assessment of his knowing exercise of the right to defend himself." (Faretta, supra, 422 U.S. at p. 836, 95 S.Ct. 2525, 45 L.Ed.2d at p. 582, fn. omitted.) "The trial court is not concerned with the wisdom of defendant's decision, or with how well he can do so. The sole relevant question is whether the defendant has the mental capacity to knowingly waive counsel while realizing the probable risks and consequences of self-representation." (People v. Clark (1992) 3 Cal.4th 41, 107, 10 Cal. Rptr.2d 554, 833 P.2d 561; see Godinez v. Moran, supra, 509 U.S. at p. 399, 113 S.Ct. at p. 2686, 125 L.Ed.2d at p. 332 ["the competence that is required of a defendant seeking to waive his right to counsel is the competence to waive the right, not the competence to represent himself'].)
But once the right to counsel is properly waived (and in this case defendant does not claim the trial court erred in granting his Faretta motion), we must recall the right of self-representation is not "a license not to comply with relevant rules of procedural and substantive law. Thus, whatever else may or may not be open to him on appeal, a defendant who elects to represent himself cannot thereafter complain that the quality of his own defense amounted to a denial of `effective assistance of counsel'" (Faretta, supra, 422 U.S. at pp. 834-835, fn. 46, 95 S.Ct. 2525, 45 L.Ed.2d at p. 581; see People v. Lopez (1977) 71 Cal.App.3d 568, 574, 138 Cal.Rptr. 36 (opn. of Gardner, P.J.) ["by choosing to represent himself, he will be throwing away one of the criminal defendant's favorite contentions on appeal"].) A defendant chooses to exercise the right of self-representation at his peril. As Presiding Justice Robert K. Puglia explained, "Respect for the dignity and autonomy of the individual is a value universally celebrated in free societies and uniformly repressed in totalitarian and authoritarian societies. Out of fidelity to that value defendant's choice must be honored even if he opts foolishly to go to hell in a handbasket. At least, if the worst happens, he can descend to the netherworld with his head held high. It's called, `Doing It My Way.'" (People v. Nauton (1994) 29 Cal. App.4th 976, 981, 34 Cal.Rptr.2d 861.)
This defendant was an experienced felon and got what he wanted: A trial his way. Nothing in common sense or Faretta entitled him to press the trial court into service as a legal advisor. We agree with the view expressed by a sisterstate court: "The fifth amendment privilege, belatedly claimed by defendant, says no more than a person shall not be compelled to speak. It does not place upon the trial court the duty of informing a pro se defendant of his rights and privileges. In fact, the courts in this State have held that a defendant who knowingly and intelligently elects to proceed pro se, `cannot expect the trial judge to relinquish his role as impartial arbiter in exchange for the dual capacity of judge and guardian angel of defendant.'" (State v. Poindexter (1984) 69 N.C.App. 691, 694, 318 S.E.2d 329, 331, cert, denied 312 N.C. 497, 322 S.E.2d 563. See 8 Wigmore, Evidence (McNaughton ed.1961) § 2269, fn. 3, p. 414 ["`such a warning would be an anomaly; it is not given for any other privilege; witnesses are in other respects supposed to know their rights; and why not here?'"].)
In short, we disagree with and decline to follow the Kramer-Killpatrick line of cases insofar as they hold or imply *29 a trial court is required to help a defendant represent himself. Once a trial court provides the Faretta warnings about the dangers of self-representation and grants a defendant's motion therefor after eliciting a voluntary waiver of his rights, the defendant is not entitled to further special admonishments or legal advice.
We hasten to add that this does not preclude a trial court from offering assistance (without abandoning neutrality) in order to facilitate the orderly conduct of the trial. "It is in the highest tradition of American jurisprudence for the trial judge to assist a person who represents himself as to the presentation of evidence, the rules of substantive law, and legal procedure, and judges who undertake to assist, in order to assure that there is no miscarriage of justice due to litigants' shortcomings in representing themselves, are to be highly commended." (People v. Redmond, supra, 71 Cal.2d at pp. 758-759, 79 Cal.Rptr. 529, 457 P.2d 321.) In this case, the trial court (and the prosecutor) helped defendant at several points during the proceedings and we commend such efforts.
What we condemn is the paternalistic (and, hence, anti-Faretta ) view that a defendant can be deemed capable of representing himself, but a trial court must nevertheless watch out to make sure he (the defendant) does not do too bad a job of asserting his constitutional rights. An indigent defendant who does not want to risk making a mistake can avail himself of the beneficence of the State (as federally mandated by the decision in Gideon v. Wainwright (1963) 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799) and accept a free lawyer. If that lawyer makes a critical mistake, a defendant can seek redress through appeal or habeas corpus. If he makes a mistake while representing himself, he has no complaint.
Finally, were we to assume the trial court (bound by existing precedent) should have followed Kramer at the time of this trial, any error was harmless.
Kramer and a few other cases hold the error is reversible per se. (E.g., People v. Solomos, supra, 83 Cal.App.3d at pp. 954-955, 148 Cal.Rptr. 248 [also concluding reversal was required if Chapman applied.] ) But the law of harmless error has matured of late. Reversal per se is reserved for structural defects. "In Arizona v. Fulminante [1991] 499 U.S. 279, 111 S.Ct. 1246, 113 L.Ed.2d 302 ... the court elaborated upon harmless error analysis by distinguishing between `trial errors,' which are subject to the general rule that a constitutional error does not require automatic reversal, and `structural' errors, which `defy analysis by harmless-error standards' and require reversal without regard to the strength of the evidence or other circumstances.... Fulminante characterized trial errors as those that occur `during the presentation of the case to the jury, and which may therefore be quantitatively assessed in the context of other evidence presented in order to determine whether [the error] was harmless beyond a reasonable doubt.' ... Structural errors, on the other hand, are `structural defects in the constitution of the trial mechanism ... affecting the framework within which the trial proceeds, rather than simply an error in the trial process itself.'" (People v. Flood (1998) 18 Cal.4th 470, 493, 76 Cal.Rptr.2d 180, 957 P.2d 869.) A particular error is structural or it is not, categorically, regardless of the fact of the case. (See Neder v. United States (1999) 527 U.S. 1, 13, 119 S.Ct. 1827, 1836, 144 L.Ed.2d 35, 50.)
So-called Kramer error is not a structural defect in the trial, but at worst is an error of procedure. In a pre-Fulminante decision we declined to find Kramer error reversible per se. In People v. Wells, supra, 261 Cal.App.2d 468, 68 Cal.Rptr. 400, Wells was an inmate charged with possession of a knife in prison; he claimed self-defense, which was not an available defense on the facts. We concluded the Kramer error was of "constitutional dimension" *30 but that the outcome would not have been different had he not testified, expressly applying the Chapman standard of prejudice: "Aside from the revelation of minor details, Wells' own testimony simply reiterated a story well known to the jury. It added nothing new to the proof of guilt, seeking only the limited objective of fortifying the self-defense claim, a claim which was ineffectual as a matter of law." (261 Cal.App.2d at pp. 481-482, 68 Cal.Rptr. 400. See also People v. Cervantes (1978) 87 Cal.App.3d 281, 289-290, 150 Cal.Rptr. 819 [following Wells ]; People v. Jackson (1978) 88 Cal.App.3d 490, 497-500, 151 Cal.Rptr. 688, 692-693, [reviewing cases, rejecting Solomos and following Wells ]; People v. Doane (1988) 200 Cal.App.3d 852, 866-867, 246 Cal.Rptr. 366 ["Nothing in Doane's testimony added to the proof of guilt ...; he made no incriminating admissions but rather attempted to explain his actions"]. We adhere to our view Kramer error (if any) does not compel reversal in all cases.
Defendant's only practical hope of success was to take the stand. The defense was self-defense. Although, as counsel pointed out at oral argument, it is theoretically possible for a defendant to succeed on such a claim without taking the stand, in the circumstances of this case that tactic could not succeed. The testimony of the guards was against him, although there were some minor discrepancies, and the other defense witnesses, apart from being felons and inmates with obvious motives to lie, had dubitable perches from which to observe the events. Defendant was at times eloquent, and invited the jury to consider the realities of prison life, the inevitable personality conflicts, and the practical inability of prisoners to obtain redress from abuse. Nothing particularly damaging came out in cross-examination. Three incidents of defendant's alleged resistance to or batteries on officers did come in, but the incidents were minor and did not subtract from the force of defendant's story which was compelling enough to induce the jury to deliver a written admonishment of the conduct of the guards. In fact, these instances bolstered the theory the guards were biased against him. Defendant not only fleshed out his side of the struggle, which the other inmates could only do imperfectly at best, he was able to provide a plausible motive for the guards to go after him, namely, to defend the honor of John Wayne. Any error was harmless beyond a reasonable doubt.
Defendant separately complains that the prosecutor should not have called him to the stand and asserts this is a structural defect in the proceedings. Defendant testified and was cross-examined. The prosecutor later called defendant as a rebuttal witness, without objection. Defendant gave a narrative cross-examination of himself in reply to the rebuttal. Defendant opened himself up to cross-examination and does not point to any "beyond the scope" objections. This materially differs from cases where a defendant is called to the stand, simpliciter. (Cf. Killpatrick v. Superior Court, supra, 153 Cal.App.2d 146, 314 P.2d 164.) No structural defect occurred and defendant articulates no coherent claim of prejudice.
We need not address the People's argument that Proposition 8 has any application to the Kramer-Killpatrick issues.

III-V[**]

DISPOSITION
The judgment is affirmed.
NICHOLSON, Acting P.J., and CALLAHAN, J., concur.
NOTES
[*] Pursuant to California Rules of Court, rule 976.1, this opinion is certified for publication with the exception of parts III, IV and V.
[**] See footnote *, ante.